THE HOMER LAUGHLIN CHINA CO.

*v.*

M. H. HIX, CLERK, ETC., *et al.*

(No. 9779)

Submitted January 29, 1946.   Decided March 19, 1946.

614

*Arthur S. Dayton* and *J. Newton Harman*, for petitioner.

*Mohler, Peters & Snyder, Chas G. Peters, H. L. Snyder* and *James G. Jeter, Jr.*, for respondents.

HAYMOND, JUDGE:

This controversy presents the question whether the respondent and claimant, Floyd B. Jividen, an employee of the petitioner, The Homer Laughlin China Company, a corporation, who voluntarily ceased to work for his employer during and because of a strike which the petitioner and the respondent both admit was conducted without the requisite authority of a national labor union, and which resulted in a stoppage of work at the factory of the company, is entitled, under the unemployment compensation law of this State, to unemployment benefits during the period of his unemployment subsequent to an offer of the striking employees, including the respondent, to return to their regular work, but which offer the petitioner did not accept.

The work stoppage and the strike which brought it about began on August 2, 1943, and the cessation of work continued until the day following the settlement of the strike by arbitration on August 17, 1943. As a result of the arbitration, all the employees of the petitioner who had engaged in the strike, including the re-

spondent, except one employee who went back to work during the strike, returned to their regular employment without change in conditions or otherwise, on or shortly after August 17, 1943. On September 16, 1943, the respondent Jividen filed his claim for unemployment compensation during the period of the work stoppage from August 2 to August 16, 1943.

This proceeding has come to this Court on writ of certiorari, after passing through a series of earlier hearings and appeals which in regular course followed the decision of the Deputy of the Director of the West Virginia Department of Unemployment Compensation, denying the claim, on September 28, 1943. On appeal by the claimant, the Trial Examiner of the Director, as an appellate tribunal of the Board of Review, on November 17, 1943, reversed the decision of the Deputy, and allowed the claimant partial unemployment benefits for the period August 2 to August 16, 1943, and later, by an amended decision on December 2, 1943, allowed such benefits for the period August 9 to August 16, 1943. An appeal was taken by the employer to the Board of Review, which, on March 18, 1944, affirmed the decision and the award of the Trial Examiner of December 2, 1943. In a proceeding by the employer in the Circuit Court of Kanawha County, that court affirmed the decision of the Board of Review by final judgment entered March 1, 1945. Writ of certiorari to that judgment, that being the form of appellate procedure provided by the statute, Section 27, Article 7, Chapter 1, Acts of the Legislature, Second Extraordinary Session, 1936, was granted by this Court.

The actual controversy to be determined in this proceeding is between the claimant and respondent Jividen, and the petitioner and employer, The Homer Laughlin China Company, and each of them has filed a brief here. As required by the statute, other persons are included as parties. They are designated as respondents, but they raise no issues and consequently they have filed no briefs in this Court.

The petitioner is an employer subject to the West Virginia Unemployment Compensation Law; and, for approximately nineteen years, the respondent was and still is one of its employees. The employer is a member of the United States Potters Association, an association of employers, and for many years that organization has been a party to a labor or wage agreement with the National Brotherhood of Operative Potters, to which Local No. 130, in which the respondent holds membership, belongs as a local or subordinate union. This agreement, mentioned in the record as the wage agreement, which has been in force for many years, having been renewed from time to time, deals with and establishes employer and employee relationships, wages, conditions of employment, and other related subjects. It is, in many respects, different from the usual agreement between an employer and an individual local union. Unlike the ordinary labor agreement, it is a pact between an association of employers and a national union. It prohibits a local union from settling disputes or points of disagreement between its members and the employers, and provides that these questions may be taken by the local to the national officers who in turn may submit them to a standing committee or a labor committee. It further stipulates that any attempt to ignore the foregoing provision will be considered an express violation of the agreement, and will cancel the right of the offending local to participate in the privileges and the wages which the contract affords. It appears that, by virtue of this agreement, there is in effect what is designated as a discharge agreement between the parties, which contains a provision that violation of the wage agreement shall be considered as just ground for immediate discharge of an employee without notice.

For some time prior to August 2, 1943, negotiations of a controversial nature were carried on between the company and the local union, because of the action of the company in advancing Brady E. Brown, an employee, from helper to kiln fireman, over Herman Smith, another

618

employee. The matter progressed to the stage at which the local union decided to go on strike on August 2, 1943. Having learned of this decision upon the part of the local, the company, through its representative, informed the local on July 29, 1943, that cessation of work would constitute a violation by the local of the wage agreement. The local was also notified to that effect by the president of the national union. Notwithstanding these admonitions, the members of the local, including the respondent, who was influential in its affairs, and, according to the employer, could have prevented the strike, went on strike on August 2, 1943, and a stoppage of work occurred at the factory, which curtailed production in its kiln firing department to the extent of seventy to seventy-five per cent, and which continued until after the strike was settled on August 17, 1943, by arbitration. This was concluded under an agreement between the company and the national union to refer the issues to an arbitrator and to the standing committee, which consisted of three representatives of the national union and three representatives of the association of employers. This group with the arbitrator acting as chairman, unanimously decided in favor of the company, concerning its action in promoting Brown over Smith as kiln fireman, and ordered that the men involved in the work stoppage be returned to their regular positions, pending the imposition of penalties against the individual members responsible for the strike. Almost immediately after the rendition of this decision all the employees of the company, who had ceased work during the strike, returned to their regular positions without any change in conditions. In the evidence given by witnesses produced in behalf of each of the parties, including the testimony and the statements of the president of the national union at the hearings, the strike is spoken of and characterized as an illegal or outlaw strike.

While the strike was in progress, on the night of August 6, 1943, at the instance of the president of the national union, a meeting of Local No. 130 was held to

determine whether the men would return to work. On August 5, 1943, the day before that meeting, the president of the national union was informed, by a representative of the company, that it would permit all of the men on strike to go back to their jobs with the exception of respondent and two other employees, who were regarded by the company as the leaders in the strike. It is not entirely clear from the record whether the president of the national union was also told at the time that the men who returned to their work would have to apply for, and go back to, their jobs as new employees. It is definitely established, however, that this information was imparted to the men on the morning of August 7, 1943, the day following the meeting. At the meeting, without being informed of these conditions, and upon the assurance of the president of the national union that if they voted to go back to work all would be permitted to do so, the members voted to resume work. The president of the national union, at the hearings in these proceedings, testified that, if he had disclosed to the men at the meeting the terms required by the company for their return to work, they would not have voted as they did.

By twelve o'clock noon, or perhaps earlier, on the day following the meeting, a committee of the local was definitely informed of the above mentioned conditions required by the company for the return of the men to work and, though the men were ready and willing to go back on the basis of the assurances given them by the president at the meeting on the night of August 6, 1943, the employees of the company refused to accept its terms and remained away from their jobs until after the strike was later settled by arbitration. The members of the local who had worked for other employers in the same locality and who had joined in the strike and participated in the meeting of August 6, 1943, returned to their employment immediately following the vote taken at that time, without any change in their working conditions.

Numerous errors are assigned by the petitioner. Within its assignments it advances, in substance, these con-

tentions: (1) The respondent, by participating in an unauthorized strike, engaged in wilful misconduct which subjected him to discharge without notice and disqualified him for unemployment benefits under the statute; (2) the respondent is disqualified for such benefits because his unemployment was due to stoppage of work caused by a labor dispute within the purview of the statute; (3) the disqualification of the respondent is not affected by any alleged lockout caused by his employer, as no such lockout occurred; (4) the respondent, by voluntarily quitting his work, terminated the relationship of employer and employee previously existing between him and the company; (5) the refusal of the company to re-employ the respondent was, in effect, a discharge for misconduct which disqualified him for unemployment benefits; and (6) the respondent is disqualified under the statute to receive either total or partial unemployment benefits.

Petitioner also asserts that the strike was unauthorized from the beginning, and that it continued as a strike of that character until it was finally settled by arbitration.

As against these contentions of the petitioner the respondent insists: (1) Though the employees of the petitioner, including the respondent, were on an unauthorized strike from August 2 through August 6, 1943, after they voted to return to work on that day and were prevented, on August 7, 1943, from so doing, because of the terms required of them by the petitioner for their return to work, a lockout was created by the petitioner, which, from that time, removed any disqualification for unemployment benefits caused by their action in striking from August 2 to August 6, 1943; (2) though the petitioner, under the contract, had the right to discharge, by reason of the unauthorized strike, it waived such right when it continued to treat the strikers as its employees; and (3) neither the lockout nor the strike terminated the relationship of employer and employee.

It is clearly established by the testimony of witnesses who testified respectively in behalf of the respondent and the petitioner, that the strike which began on August 2, 1943, was not authorized by the national union, and that the respondent voluntarily participated in it as one of the leaders. These facts are conceded by counsel for each of the parties in the briefs and in the argument. But the respondent and the petitioner are in sharp disagreement concerning the status of the work stoppage after the vote was taken on August 6, 1943, that the men should return to work. The position of the petitioner is that the strike was an unauthorized strike and continued as such, after the men refused to go back to their jobs, until its final settlement by arbitration, and that the relationship of employer and employee was terminated during the strike, by the action of the men in quitting and remaining away from their jobs or in refusing to return to work when the employer offered to take back all the men except the respondent and the two other employees. The position of the respondent is that though the strike was originally unauthorized, it ceased to continue as such after the men voted to return to work, and that the action of the employer in imposing new terms and conditions for the return of the men to work constituted a lockout which has been defined as a cessation of the furnishing of work to employees in an effort to get, for the employer, more favorable terms. *Iron Molders' Union No. 125* v. *Allis-Chalmers Company,* (7th Cir.) 166 Fed. 45.

The argument that the strike continued until its settlement under the arbitration agreement on August 17, 1943, is persuasive, as it would seem that mutual agreement is necessary to put an end to a strike and to enable the men to return to their jobs after an interruption of their work has occurred. That some type of agreement was necessary to compose the strike is demonstrated by the course pursued and which resulted in a settlement by arbitration under an agreement to arbitrate the differences that existed. As to the question

whether the action of a workman in withdrawing from his job and participating in a strike which results in a stoppage of work terminates, for such workman, the relationship of employer and employee, the answer depends upon the particular circumstances of each case. The existence of facts could readily be supposed which would end such relationship without an express discharge. Such a situation was held to exist in the case of *National Labor Relations Board* v. *Sands Manufacturing Co.*, 306 U. S. 332, 83 L. Ed. 682, 59 S. Ct. 508, where the employer, under a contract with a labor organization which gave it the right to operate its plant on the basis of departmental seniority, was required to close its plant, and did so, after the labor organization, in violation of its agreement, demanded that the employer abandon that basis and, at the time the plant was closed, no further negotiations were pending, no arrangements for any further meetings existed, and each of the parties had definitely rejected the demands of the other. In that status, the Court held that the relationship of employer and employee had ceased to exist. On the other hand, under the National Labor Relations Act, men may strike in connection with a current labor dispute without putting an end to the employment relationship; and, during a strike, the mere quitting of work by an employee, in circumstances which do not definitely preclude further negotiations, does not necessarily terminate the relationship of employer and employee. *National Labor Relations Board* v. *Mackay Radio & Telegraph Co.*, 304 U. S. 333, 82 L. Ed. 1381, 58 S. Ct. 904; *Jeffery-DeWitt Insulator Co.* v. *National Labor Relations Board*, 91 Fed 2d 134; *Fryns* v. *Fair Lawn Fur Dressing Co.*, 114 N. J. Eq. 462, 168 Atl. 862. Likewise the existence or the absence of a lockout depends upon the facts of the particular case. The specific contentions of the parties give rise to problems which, in the opinion of this Court, extend beyond the controlling issues of this litigation. Their solution is not essential to a decision of this controversy and they need not be further discussed, except to the extent requisite to determine the applicability of

the pertinent provisions of the statute of this State, in force at the time, to the practically undisputed facts which, by the record, are here shown to exist.

Regardless of the character of the strike, the status of the employer and employee relationship, or the existence of a lockout, a question that need not be, and is not now, decided, the decisive issue in this case is whether the company, by refusing to permit the men on strike to return to their former positions, except as new employees, required them to accept conditions of employment less favorable than those prevailing for similar work in the same locality, within the meaning of the last sentence of Subsection 4, Section 4, Article 6, Chapter 76, Acts of the Legislature, 1943.

As the decision turns upon that point, it is proper to consider in detail the language of the section and the subsection of the statute. The language is, in effect, that upon the determination of the facts by the Director of Unemployment Compensation, an individual shall be disqualified for benefits for a week in which his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which he was last employed, unless the Director is satisfied that he was not participating, financing, or directly interested in such dispute, and did not belong to a grade or class of workers who were participating, financing, or directly interested in the labor dispute which resulted in the stoppage of work. The subsection also declares that no disqualification, under the foregoing provisions, shall be imposed if the employees are required to accept wages, hours or *conditions of employment less favorable than those prevailing for similar work in the locality,* or if the employees are denied the right of collective bargaining under generally prevailing conditions, or if an employer shuts down his plant or operation or dismisses his employees in order to force wage reduction, changes in hours or working conditions. (Emphasis added). The section contains other provisions which are not

here pertinent.

It is clear that the work stoppage which occurred in the factory of the petitioner in August, 1943, and the strike which caused it, existed because of a labor dispute. The differences which here arose were between the employer and the striking employees and resulted in a breach by the employees of the wage agreement. *Miners in General Group* v. *Hix*, 123 W. Va. 637, 17 S. E. 2d 810.

The law gives full recognition to the unquestioned right of employees to strike and to quit their employment. Here the employees of the petitioner had the right to quit their jobs and to go on strike, in the sense that they violated no express or positive provision of any law in so doing. Their conduct was peaceable and without any violence or disorder. No trespass to person or to property occurred; and no unlawful acts whatsoever were engaged in or committed. In these respects the strike in which the respondent engaged was entirely different from the strike which the Supreme Court of the United States denounced as unlawful in the case of *National Labor Relations Board* v. *Fansteel Metallurgical Corporation*, 306 U. S. 240, 83 L. Ed. 627, 59 S. Ct. 490, in which the legal status of a sit-down strike was involved. But for the provisions of the wage agreement the action of the men could subject them or the local to no legal responsibility. It is true that the strike and the absence from their work, in the circumstances, constituted an inexcusable violation of the wage agreement, not countenanced by the national union, which subjected the men and the local to all the consequences which the law imposes as a result of their breach of the contract; and, for those reasons, the strike, though not unlawful as a violation of any express or positive provision of law, was instituted and carried on without any authority from the responsible officers of the national union and contrary to the terms of the wage agreement.

It is also beyond question that the company had the right, under the contract, and because of the violation

of its terms by the local, to discharge the striking employees, and that it did not waive that right by its subsequent negotiations with the local prior to the termination of the arbitration. The company could also have exercised its right to discharge in the manner provided in the discharge agreement, without the use of the separation notice, referred to in the regulations of the Unemployment Compensation Department, which, when issued, does not precede or coexist with, but which necessarily follows, any discharge. An important purpose of such separation notice appears to be to inform the Department of the separation from employment that has already occurred. But the right to discharge was not self executing in its nature. The company did not exercise this right and consequently the relationship of employer and employee, in the undisputed circumstances which then existed, was not terminated during the stoppage of the work. That the company refrained from exercising its right to discharge, however, did not impair or abolish its ordinary and general rights, in the premises, which existed by general law or under the wage agreement or otherwise.

In the exercise by the respondent and by the company of the rights accorded to each by law and as established by the valid provisions of the wage agreement, each of them was, of course, subject to and limited by the requirements of the Unemployment Compensation Law of this State, to the extent the actions of each were within the scope of, and involved the subject matter covered by, that statute. The primary purpose of the Unemployment Compensation Law is not to regulate or control the relationship of employer and employee, but to provide reasonable and effective means for the promotion of social and economic security by reducing as far as practicable the hazards of unemployment, and in so doing to deal comprehensively with unemployment compensation funds and benefits. The decisive issue in this case involves the rights and the duties of each under the statute and in its determination the statute must be given its full force

and effect.

The employer also had the right, under the contract, to refuse to permit the respondent and the other two employees to return to their jobs because of their misconduct in violating the agreement. If the course taken by the company had consisted of nothing more than such conduct, it is plain that the last provision of the subsection of the statute, eliminating any disqualification of a worker whose unemployment is due to a stoppage of work which exists because of a labor dispute at the factory at which he was last employed, would have no force or application in this proceeding.

But the action of the company did not end with the requirement that respondent and the other two employees be not permitted to return to work because of their participation in the strike. After the local, in the mistaken belief that all the striking employees of the company would be taken back without any change in their former working conditions, had voted on August 6, 1943, that the men would return to work, and after its members who were employees of other employers had returned to regular work in the same locality, without any change in their former conditions of employment, the petitioner on August 7, 1943, refused to take back its employees, including the respondent, unless they should apply for and return to their positions as new employees. This condition, if accepted by the employees, would, of necessity, have deprived them of their rights of seniority, which are often more valuable to, and are more highly prized and cherished by, the workmen, than almost any other incident of their employment.

By imposing that restriction, on August 7, 1943, as requisite to the return of the men to the positions they held before the strike, the petitioner required its employees, including the respondent, if he were taken back at all, to accept conditions of employment less favorable than those prevailing for similar work in the locality, within the terms of the statute. This action upon its part

operated to prevent any disqualification of the respond-ent for unemployment benefits under Subsection 4, Sec-tion 4, Article 6, Chapter 76, Acts of the Legislature, 1943, during the period August 2 to August 16, 1943, which subsection, but for such action by the employer, would have disqualified the respondent for benefits for the week of August 2 to August 9, 1943, because of a stoppage of work resulting from a labor dispute.

By his action in voluntarily leaving his work, however, the respondent, under the terms of the statute, Subsec-tion 1, Section 4, Article 6, Chapter 76, Acts of the Legis-lature, 1943, is disqualified for unemployment benefits for the week of August 2 to August 9, 1943. On August 2 he left his work voluntarily without good cause in-volving any fault upon the part of the employer, to en-gage in the strike, in violation of the wage agreement. During the period August 2 to August 6, 1943, while he was so absent, the company had taken no action, which amounted to an exclusion of his disqualification under Subsection 4, Section 4, Article 6, Chapter 76, Acts of the Legislature, 1943. For the period of one week from August 2, 1943, the respondent was disqualified for bene-fits by the provisions of Subsection 1, Section 4, Article 6, Chapter 76, Acts of the Legislature, 1943; and this disqualification remained in effect until, but did not con-tinue beyond, the 9th day of August, 1943. After the vote on August 6, 1943, the respondent was willing to go back to his work; but he was prevented from so do-ing by the action of the employer, on August 7, 1943, in requiring a change in the conditions of employment.

Subsections 1 and 4, Section 4, Article 6, Chapter 76, Acts of the Legislature, 1943, are not exclusive of each other. The conduct of the respondent brings him with-in the scope of each subsection, and these subsections, in the circumstances which arise in this proceeding, should be read, considered and applied together. From August 2 to August 6, 1943, because of his voluntary absence from work, in the situation which then existed,

the respondent was subject to both Subsection 1 and Subsection 4; but after the action of the company on August 7, 1943, requiring a change in the conditions of employment, he was within the disqualification exclusion provision of the last sentence of Subsection 4. In short, the respondent is disqualified for benefits under Subsection 1, Section 4, Article 6, Chapter 76, Acts of the Legislature, 1943, for the week of August 2 to August 9, 1943, but any disqualification under Subsection 4, Section 4, Article 6, Chapter 76, Acts of the Legislature, 1943, for the same period, has been eliminated by the above mentioned action of the company on August 7, 1943. That he is disqualified for benefits for the week of August 2 to August 9, 1943, is, in effect, conceded by the respondent, for the claim which he makes in this Court is for partial unemployment benefits only for the week of August 9 to August 16, 1943.

The remaining question of importance is the character of the unemployment of the respondent. As to the period of one week, from August 9 to August 16, 1943, he vigorously asserts that he is entitled to partial unemployment benefits for the reason that less than one-half of his normal shift expectancy was available to him; and it is established that this expectancy, during the ten working days of the pay period August 3 to August 16, 1943, was eight hours for each of those days. The petitioner insists, however, that as the respondent did not work at all during the period of the work stoppage his employment was not partial but total in character. This contention is sound. Partial unemployment, as contemplated by the statute, applies to a situation in which work is performed on a unitary part time basis and not to a situation in which, for a definite period of time, no work whatsoever is performed. Partial unemployment necessarily implies that there be some degree of employment. If there be no employment whatsoever the unemployment is not partial but total in its nature. In the circumstances which here exist the unemployment was total.

It is argued that the unemployment of the respondent was not total because, though no services were performed by, and no wages were payable to, the respondent, he was not separated from employment, and that separation from employment requires a discharge, or the termination, by some other means, of the relationship of employer and employee. This argument is not convincing and it ignores the real situation that existed as shown by the undisputed evidence in the case. Total unemployment benefits under the statute may accrue, and a claim for such benefits may be allowed, to a claimant who complies with the statutory requirements governing such claim, without his discharge from employment and without the termination of the relationship of employer and employee.

The unemployment of the respondent, being total in character, is subject to the waiting period of one week which must elapse before total unemployment benefits under the statute may be received. Subsection 4, section 1, Article 6, Chapter 97, Acts of the Legislature, 1941. During such waiting period the claimant must be eligible for unemployment benefits in all respects except as to the requirement that he has made claim in accordance with the provisions of Article 7 of that chapter. Subsection 2, Section 1, Article 6, Chapter 97, Acts of the Legislature, 1941. For the week of August 2 to August 9, 1943, the respondent was not so eligible because his disqualification under Subsection 1, Section 4, Article 6, Chapter 76, Acts of the Legislature, 1943, did not cease until August 9, 1943. He was, however, so eligible from and after August 9, 1943. The waiting period coincides with the week from August 9 to August 16, 1943, which is the only week within the period embraced in the claim of the respondent in which he was not, under the statute, disqualified for unemployment benefits. Accordingly, the operation of the statutory provision for the waiting period of one week prevents the receipt by him of any of the unemployment benefits for which he makes claim. It follows that the claim of the respondent is not allow-

able under the statute and it must, for that reason, be denied.

For the reasons stated the orders of the Circuit Court of Kanawha County and the order of the Board of Review of the Department of Unemployment Compensation, allowing the claim of the respondent, Floyd B. Jividen, are reversed and set aside, and this proceeding is remanded to the Board with directions to deny the claim.

*Reversed and remanded with directions.*