Midvale Company, Appellant, *v.* Unemployment
Compensation Board of Review.

Cybok Unemployment Compensation Case.

Argued July 15, 1949.  Before RHODES, P. J., HIRT,
RENO, DITHRICH, ROSS, ARNOLD and FINE, JJ.

*Frederick H. Knight,* with him *Miles W. Kirkpatrick* and *Morgan, Lewis & Bockius,* for appellant.

*William L. Hammond,* Special Deputy Attorney General, with him *Richard H. Wagner,* Associate Counsel and *T. McKeen Chidsey,* Attorney General, for appellee.

*Edward Davis,* for claimant-intervenors.

*Arthur H. James* submitted a brief, under Rule 61, for Glen Alden Coal Company et al.

OPINION BY DITHRICH, J., July 30, 1949:

This appeal from a decision of the Unemployment Compensation Board, hereinafter referred to as the Board (Clements dissenting), involves the right of 2,270 industrial employes of The Midvale Company, hereinafter referred to as the Employer, to receive an aggregate sum of approximately $1,000,000 in benefits, with the consequent effect upon the Employer's future contribution rate. Claimants, having registered for work and having filed applications for benefits, filed weekly claims for a period of unemployment commencing on or about May 26, 1948. On July 2, 1948, the Bureau of Employment and Unemployment Compensation, hereinafter referred to as the Bureau, rendered formal decisions allowing the claims of approximately six of the claimants with a view to using these decisions as "test cases" for determining the eligibility of all of the claimants.

The Bureau's decision was that the claimants' unemployment was "due to causes other than a stoppage of work." The Employer, contending that the claimants were disqualified from receiving benefits on the ground

that their unemployment was "due to a stoppage of work because of a labor dispute," appealed to the Board. At the same time the Bureau, the Employer, and the claimants (the latter acting through Federal Labor Union No. 18887, A. F. of L., hereinafter referred to as the Union), entered into an agreement that the appeals in these cases should cover all the hourly paid employes, including incentive workers, hereinafter more specifically referred to, who had filed claims for compensation. The Board thereupon took original jurisdiction of the appeals and, after numerous hearings, rendered a decision modifying and affirming the Bureau's decision and holding that the claimants were entitled to benefits for the four-week period commencing May 30, 1948, rather than May 26, as held by the Bureau. Claims for this four-week period, to wit, May 30 to July 2, 1948, have been paid. The Bureau subsequently rendered decisions also allowing claims filed subsequent to July 2, 1948, and extending to November 24, 1948, when the claimants returned to work. The Employer appealed, but the Board has reserved its decision pending the final outcome of this appeal.

In Review Decision No. 4392, the Veterans Administration affirmed the decision of the Readjustment Allowance Agent for Pennsylvania that "the unemployment of the claimants from May 26 through August 10, 1948, the date of a hearing in this matter, was due to a stoppage of work that existed because of a labor dispute at the factory . . . where the claimants were last employed; that the claimants were interested in the labor dispute; and that the claimants were thereby disqualified from receiving an allowance for any week within this period."

The essential findings of fact upon which the Board based its decision, and by which we are bound, provided they are supported by substantial competent evidence, are as follows: The Employer, which is engaged in the

steel business, operates a plant in Philadelphia, which includes a melting department, machine shops, and a rolling mill. Approximately 550 of the 2,270 employes work in the machine shops and about 50 in the melting department. These 600 employes have been for a considerable period of time employed on an " 'incentive basis,' i.e., a certain number of hours is assigned as a standard working time for a certain job and the employe who performs it is then paid his hourly rate for this number of hours although his actual working time may have been less." The remainder of the employes work on a straight hourly basis.

The Employer and the Union, on April 30, 1947, entered into a collective bargaining agreement which fixed the hourly rates of the general employes and the time rates of the incentive workers. The agreement provided that on or before May 1, 1948, either party might give notice of its desire to negotiate a "general and uniform change in rates of pay" and that, upon failure of the parties to agree to such a change, the Union would not be bound by the no-strike clause and the Employer would not be bound by the provisions relating to rates of pay, but all other terms of the contract would remain in effect until April 30, 1949.

In March, 1948, the Employer notified the Union of its intention to effect certain wage reductions in the time rates of the incentive workers for the reason that the earnings of these workers were too high in proportion to the work they produced, as compared to the wages paid for similar work by the Employer's competitors. After negotiations had been entered into, the Employer proposed to the Union that it agree to the elimination of the incentive system or accept a general and uniform wage reduction of ten cents an hour for all employes. The Union countered with a demand for a general wage increase of thirty-five cents an hour. It offered, however, to continue working on the existing terms of employ-

ment and to continue in co-operation with the Employer to make adjustments in the time rates of the incentive workers and submit to arbitration the question of wage reductions, provided it would be given the right to reopen the wage negotiations when the national wage pattern for the steel industry had been set.

The Employer rejected the Union's proposal and on May 25, 1948, notified the Union of a general and uniform cut of ten cents an hour, effective as of May 30, 1948. The Union then renewed its demand for an increase, but in the reduced amount of seventeen cents an hour. The employes stopped work on May 26, four days before the effective date of the proposed cut in wages, and there was a general cessation or "stoppage of work" until November 24, 1948, when a written agreement was entered into granting an increase in the amount of ten cents per hour for all employes, except incentive workers in the machine shops, who were guaranteed against any reduction in their average earnings during a representative period prior to the date of the stoppage. The agreement provided, among other things, that: ". . . the present *stoppage of work* shall terminate and the Union shall immediately notify its membership to that effect and advise employees to return to work upon being recalled by the Company." (Italics supplied.)

Section 402 (d) of the Unemployment Compensation Law, as amended by the Act of June 30, 1947, P. L. 1186, §2, 43 PS §802, provides, in part, that: "An employe shall be ineligible for compensation for any week— . . . (d) In which his unemployment is due to a *stoppage of work*, which exists *because of a labor dispute* at the factory, establishment or other premises at which he is or was last employed: . . ." (Italics supplied.)

Since there admittedly was a "labor dispute at the factory" the question is: was there a "stoppage of work" within the meaning of section 402 (d)? Appellant con-

tends that a "stoppage of work" includes all stoppages regardless of fault or blame; on the other hand, the claimants contend, and the Board has held, that "stoppage of work" applies only to stoppage due to the fault of the employes and that the stoppage at the Midvale plant was due to the action of the Employer through no fault of the employes. The Board takes the position that "stoppage of work" does not mean a complete cessation of operations, but merely a "substantial curtailment of operations."

A brief has been filed under Rule 61 on behalf of a number of coal companies who are large employers of labor, subject to the obligations of the Unemployment Compensation Law, and interested in the outcome of this appeal.

Section 402 (d), as amended by the Act of May 29, 1945, P. L. 1145, §9, 43 PS §802, provided that: "An employe shall be ineligible for compensation for any week— . . . (d) In which his unemployment is due to a *voluntary suspension of work* resulting from an industrial dispute . . ." (Italics supplied.) In our opinion the elimination of the words "voluntary suspension of work" contained in the amendment of 1945 and the substitution therefor of the words "stoppage of work" in the amendment of 1947 is most significant and clearly evinces an intent on the part of the Legislature to remove from consideration in determining eligibility, and to render immaterial, any question as to the voluntary or involuntary nature of or the blame or fault for the stoppage.

The intent of this change is further emphasized by the following proviso, which was added to section 402 (b) by the 1947 amendment: "And provided further, That the provisions of this subsection [as to good cause for leaving employment] shall not apply in the event of a stoppage of work, which exists because of a labor dispute within the meaning of subsection (d)."

While this is a case of first impression in this Commonwealth the correct answer to the question involved was indicated in the *Bonomo Unemployment Compensation Case*, 161 Pa. Superior Ct. 622, 56 A. 2d 288. We there said, in an opinion by RHODES, P. J., at page 628: "It is not without some significance that the Legislature, since this controversy arose [over the length of the period of disqualification, provided by §402 (d)], further amended section 402 (d) of the Unemployment Compensation Law by the Act of June 30, 1947, . . . [P. L. 1186] making the employee ineligible for compensation 'for any week . . . (d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute . . .' "

But while there is a paucity of decision both at and above the administrative level in this State, on examination of the statutes and decisions in twenty-six other states we find that in no other jurisdiction has there been a ruling contrary to the minority opinion of the Board in this case that "section 402 (d) . . . as amended . . . in 1947 . . . prohibits the payment of benefits if one's unemployment springs from a stoppage of work which exists because of a labor dispute."

A case directly in point is *In re North River Logging Co.*, 130 P. 2d 64 (Supreme Court of Washington). It was there held that a shutdown of a logging camp by the company operating it, because of the refusal by some of its employes to work on a straight time basis on the Saturday following Labor Day in order to make up time lost by the observance of the holiday, was a lockout constituting a "labor dispute" within the provision of the Washington unemployment compensation act disqualifying individuals for benefits for any week during which their unemployment was due to *stoppage of work because of a labor dispute*, as operations were suspended by the employer as the result of a dispute with employes over wages and hours. The Court held that the afore-

said section made an exception to the generally declared purpose of the act to provide compensation in all cases of "involuntary unemployment." It further held, at page 66, "That a lockout is a labor dispute in contemplation of the unemployment compensation act, we think . . . clear for several reasons," and then enumerated five cogent reasons. Among them were:

"Under statutes of identical or of similar import . . . the administrative officers of all states, except Maryland,[1] where the question has arisen, have adopted the same view. . . .

"Recognizing the lockout to be a labor dispute . . . the legislatures of some states have, in specific terms, eliminated or qualified it as a ground of disqualification for benefits.[2] . . .

"In this connection, it may be noted that our own act, . . . recognizes the lockout as a labor dispute in that it provides that an individual shall not be disqualified for benefits for refusing to accept work 'If the position offered is vacant due directly to a strike, *lockout, or other labor dispute.*' "

Section 4 (t), as amended by the Act of May 29, 1945, P. L. 1145, §4, 43 PS §753, in defining "suitable work" is identical with the Washington statute in declaring that no work shall be deemed suitable in which "the position offered is vacant, due directly to a strike, lockout, or other labor dispute."

That "other labor dispute" as a generic term includes within its meaning a strike or a lockout is not open to question. That it means the same thing in section 402 (d) as in section 4 (t) is obvious under the familiar and well settled rule of construction that "Where the meaning of a word or phrase is clear as used in one section of the act, it will be construed to mean the same thing in another. Com. v. Stingel, 156 Pa. Superior Ct.

[1] Maryland has since adopted the same view.
[2] See Act of May 23, 1949, No. 530, infra.

359, 362, 40 A. 2d 140": *Bonomo Unemployment Compensation Case,* supra, page 628.

In *Adkins v. Indiana Employment Security Division,* 117 Ind. App. 132, 70 N. E. 2d 31, 35, after quoting with approval the five reasons set forth in the *North River Logging Co.* case, the Court held:

"As we view the evidence in this case, it is immaterial whether appellants' unemployment was caused by a 'strike' or a 'lockout' for the reason that in either event it is crystal clear that such unemployment was the direct and immediate result of . . . a 'labor dispute' within the meaning and purview of Section 7 (f) (3) of the Indiana Employment Security Act. [Citing cases.]"

See, also, *Unemployment Compensation Commission of Alaska v. Aragon,* 329 U. S. 143; *Bankston Creek Collieries, Inc., v. Gordon,* 77 N. E. 2d 670 (Supreme Court of Illinois). In the latter case the Court said, page 675: ". . . that the statute does not differentiate between the stoppage of work caused by the employer and the one brought about by the employees, provided the stoppage of work is caused by a labor dispute. *The statute does not undertake to consider which party is responsible for the stoppage, the material element being there is a stoppage of work caused by a labor dispute. . . .* (Italics supplied.)

"We are not deciding here who should be blamed as between the employer and the employee for the stoppage of work, but we do hold that the stoppage of work arose out of a labor dispute . . ."

In *Fash v. Gordon,* 75 N. E. 2d 294, the same Court held, p. 297, that "if a labor dispute results in the employer closing his plant or factory the statute does not place the blame, but considers such unemployment caused by a labor dispute, and therefore not involuntary unemployment."

In its brief the Board says: "Some state statutes *expressly* include 'lockouts' as a ground for disqualifica-

tion in their labor dispute sections. [Citing cases.] Where this is true, the employes are, of course, disqualified in such cases. Had the Pennsylvania Legislature intended to make an exception to the fundamental principle declared in section 3 of the Act by denying benefits in lockout cases, is it not reasonable to assume that it would have so provided?"

The answer to that query is found in the Act of May 23, 1949, No. 530, which expressly provides that "An employe shall be ineligible for compensation for any week— . . . (d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (*other than a lockout*) . . ." The amendment of 1949 is additional evidence that the amendment of 1947 included lockouts, otherwise there would have been no reason for the 1949 amendment expressly excluding them. "It is an elemental rule of statutory construction that a change of language in a statute indicates a change of legislative intent: Ogilvie's Estate, 291 Pa. 326, 333, 139 A. 826; Commonwealth v. Lowe Coal Company, 296 Pa. 359, 365, 145 A. 916; Dixon's Case, 138 Pa. Superior Ct. 385, 391, 11 A. 2d 169": *Vince v. Allegheny Pittsburgh Coal Co.*, 153 Pa. Superior Ct. 333, 337, 33 A. 2d 788.

Finally, it is urged upon us that we cannot hold that an employe is ineligible for compensation benefits where there is a stoppage of work because of a labor dispute regardless of who is at fault—assuming that the employes were not at fault in the instant case, keeping in mind, however, that they quit work four days before the effective date of the wage reduction—without doing violence to the declared policy of the Act to provide compensation for loss of wages by employes during periods when they become unemployed through no fault of their own. But as we said in the *Bonomo Unemployment Compensation Case*, supra, page 627, ". . . the general declaration of

public policy, as it may relate to unemployment caused by the employee, must yield to the specific designation contained in section 402 (d)."

Furthermore, "When the words of a law are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit": Statutory Construction Act of May 28, 1937, P. L. 1019, article IV, section 51, 46 PS §551. In our judgment the words of the amendment of 1947 are so "clear and free from all ambiguity" that there is no need to resort to the preamble for a determination of their meaning. If the amendment of 1947 was not in keeping with the declared policy of the Act, it seems quite clear that the Legislature knowingly, deliberately, and intentionally departed therefrom, and as stated in the *North River Logging Co.* case "makes an exception to the generally declared purpose of the act to provide compensation in all cases of involuntary unemployment," in line with a majority of the states.

The majority opinion says: "we adhere without equivocation to our ruling in the Roy Manufacturing Company case [claim of Norine Fetter et al., Appeal No. B-44-92-I-464-A, Decision Nos. B-15548 to B-15637, April 13, 1948]." The Board decided in that case that "While it is true that the courts, in the cases last mentioned, employed the provisions of the declaration of public policy in order to find a legislative intent which, in those cases, ultimately resulted in the denial of benefits, this does not detract from the principle that the declaration of public policy is *controlling in any situation* where the legislative intent is in doubt." We, too, adhere to the ruling "in those cases [Barclay White Co. v. Unemployment Compensation Board of Review, 356 Pa. 43, 50 A. 2d 336; Dawkins Unemployment Compensation Case, 358 Pa. 224, 56 A. 2d 254] . . . where the legislative intent is in doubt." But where it is crystal clear and en-

tirely free of doubt, as in the 1947 amendment, we have no hesitancy in construing the amendment to mean exactly what it says and in reiterating that the "general declaration of public policy . . . must yield to the specific designation contained in section 402 (d)."

Decision reversed.

RENO, J., concurs in the result.