CUMBERLAND AND ALLEGHENY GAS COMPANY

*v.*

LEWIS A. HATCHER, *Clerk, etc., et al.*

(No. 12180)

Submitted January 15, 1963.     Decided March 12, 1963.

Kay, Casto & Chaney, Vincent V. Chaney, James Alfred Avirett, for petitioner.

C. Reeves Taylor, Joseph A. Blundon, for respondents.

CALHOUN, JUDGE:

This case involves a proceeding upon a writ of certiorari granted by this Court to the Circuit Court of Kanawha County pursuant to the provisions of Chapter 21A, Article 7, Section 27 of the Code, 1931, as amended, from a decision and order of the circuit court which affirmed a prior decision of the Board of Review of the West Virginia Department of Employment Security, the effect of which was to affirm an award of unemployment benefits to various claimants for loss of work during the period from July 29, 1960, to August 26, 1960.

The basic question presented is whether the claimants were unemployed during the period in question "due to a

stoppage of work" which existed "because of a labor dispute" pursuant to the provisions of Section 4 (4), Article 6, Chapter 21A, Code, 1931, as amended.

The Cumberland and Allegheny Gas Company (referred to herein as the employer or as the gas company), a corporation organized and existing under the laws of West Virginia, with offices at Keyser, is a public utility engaged in the business of supplying and selling natural gas to industrial and domestic consumers in certain adjacent areas in West Virginia and Maryland. It is an "employer" within the meaning of Chapter 21A, Code, 1931, as amended.

The claimants are respondents David L. McRobie, Harry K. Thomas, Robert L. Fisher, Jr., Walter H. Ganoe, William P. Davis, Timothy F. Kady, Robert F. Kalbaugh, Charles J. King, Jr., William H. Grove, Victor Liller, Jr., Donald McKenzie, Frederick J. Neff, Lacy L. Tinsley and Grover T. Bosley. With the exception of Harry K. Thomas, the claimants are members of a local bargaining unit and labor organization known as Local No. 419, Utility Workers Union of America.

In August, 1960, the claimants filed with the West Virginia Department of Employment Security their individual claims for unemployment compensation benefits under the provisions of Chapter 21A of Code, 1931, as amended, due to unemployment during the period from July 29, 1960, to August 26, 1960. By decisions rendered on September 15 and 16, 1960, by two different deputies in the department of employment security (each of which deputies considered claims of different groups of claimants), findings were made that the claimants were eligible for unemployment benefits and were not disqualified therefrom. The employer, Cumberland and Allegheny Gas Company, duly appealed from the deputies' decisions. Upon appeal a hearing was held on October 25, 1960, before a trial examiner for the Board of Review of the West Virginia Department of Employment Security. The trial examiner affirmed the decisions of the deputies.

The employer thereupon appealed to the board of review from the decision of the trial examiner. On April 25, 1961

a hearing on such appeal was held by the board of review at which hearing additional evidence was received. By a decision dated July 14, 1961, the board of review affirmed the decision of its trial examiner. Both the opinion of the trial examiner and the opinion of the board of review, upon which their respective decisions were based, held that there was a labor dispute in existence at the time claimants were unemployed, and that the claimants' unemployment occurred because of such labor dispute; but the trial examiner and the board of review further held that there was no "stoppage of work" within the meaning of Chapter 21A, Article 6, Section 4 (4) of the Code, 1931, as amended, and that therefore the claimants were not disqualified from receiving benefits under the provisions of the statute.

. An appeal from the decision of the board of review was duly made to the Circuit Court of Kanawha County, West Virginia. After a review of the record and consideration of briefs filed by the parties, the circuit court by an order dated February 8, 1962, entered a judgment affirming the final order of the board of review.

For many years prior to the events giving rise to this case, the gas company and the union had operated under collective bargaining contracts. Each of these contracts was for one year and ran from June 1 of one year to June 1 of the next year. Each party had the right to terminate the contract by giving notice to the other party sixty days prior to June 1. If neither party gave such notice, the contract was automatically renewed for another year.

On March 22, 1960, the union advised the gas company that the collective bargaining contract then in existence between the union and the gas company would cease to be in effect and would be terminated as of June 1, 1960. Subsequent to the giving by the union and receipt by the gas company of such notice of termination, the gas company and the union entered into and carried on extensive collective bargaining negotiations. Although six or more meetings were held, the parties were unable to arrive at an agreement or to agree to the execution of a new collective bargaining contract despite the fact that the gas company proposed and of-

fered to renew the collective bargaining contract which had been in effect prior to June 1, 1960, for an additional one-year period and further offered to make retroactive in a new contract any pertinent benefits which might result to employees from negotiations then being carried on in other parts of the gas company's system.

During the month of June, 1960, while the negotiations and meetings were in progress between the gas company and the union, a secret strike vote was taken by the union. This was termed "a vote of confidence" but in effect it was an authorization by members of Local 419 to their regional representative to call a strike against the gas company whenever the international union might see fit to do so. This placed the gas company in the position of operating without any contractural safeguards against strikes and under the continuing possibility of having a strike called at any time chosen by the union. This presented to the gas company, according to its contention and testimony, the danger of having a strike called during the winter period when the gas company's duty as a public utility to supply gas to its customers for space heating purposes would be crucial. In these circumstances, the gas company imposed a partial lockout while the weather was still warm.

On July 29, 1960, a final meeting was held between representatives of the gas company and the union. Negotiations had come to a complete impasse on the primary issue of wages. The gas company then issued the following statement to the union and to all claimants involved in this case:

"As a consequence of the impasse in contract negotiations between Local 419 and Cumberland and Allegheny Gas Company, the Company will impose a partial lockout to become effective as of midnight, Friday, July 29, 1960.

"The lockout will include all members of Local 419, UWUA with the exception of those assigned to special duty. Individuals selected for special duty will be so informed by their supervisors. * * *."

The gas company accordingly called the lockout affecting all members of Local 419 "with the exception of those as-

signed to special duty" and sent a letter to each of its employees explaining the entire situation.

Picket lines were placed around all of the gas company's properties and places of business. Picketing was continued in a peaceable manner by the union until August 26, 1960, when the labor dispute was terminated. In the meantime the gas company sought to have the union furnish seventeen men to perform emergency work during the period of the partial lockout. This the union refused to do. Each of the claimants was offered an opportunity to be included among the list of seventeen men to perform emergency work during the period of the partial lockout and none of the claimants accepted such offer.

During the period from July 29, 1960, to August 26, 1960, as a result of this labor dispute, the gas company's entire labor force of 79 men who were paid on an hourly basis ceased to work. No new employees were hired by the gas company to perform any of their duties, but emergency or essential duties normally performed by the claimants were performed by seventeen supervisory and promotional employees of the company. According to the testimony of the gas company's district office manager, William A. Withrow, the company's overall operations were curtailed by approximately eighty per cent and work in thirteen necessary and essential categories of the gas company's business and operations either ceased entirely or was performed on an emergency and partial basis only where and when considerations of public safety made such work absolutely necessary. The witness also testified that, while work in all categories of labor employed by the gas company either ceased entirely or almost entirely, it was only because of the extraordinary, around-the-clock, emergency efforts of the supervisory personnel that the gas company was able to avoid a violation of its legal duty as a public utility to maintain the flow of gas through the gas company's mains to its customers.

Withrow's estimate that the gas company's overall activity was curtailed approximately eighty per cent during the period of the partial lockout is apparently based on the num-

ber of employees affected thereby in relation to the total number of persons employed by the gas company in all categories. During the period of the partial lockout, meters through which natural gas passed to domestic customers, numbering approximately twenty thousand, were not read, but such domestic customers were billed on an estimated basis and proper adjustments of such estimates were made after normal operations were resumed. There were approximately twenty to twenty-five customers in an industrial category, and it was necessary to read the meters in this category in the customary manner during the period in question. Withrow testified that, when normal operations were resumed after the settlement of the labor dispute, it was not necessary to employ additional personnel or to place any regular employees on an overtime basis in order to take care of any backlog of work arising from the suspension of normal work. The witness was unable to state and the gas company did not undertake to prove that its revenues were lessened or otherwise adversely affected by the partial lockout. It appears reasonably from Withrow's testimony that the amount of gas supplied and sold to customers was not lessened by the partial lockout.

Under the provisions of Chapter 21A, Article 6, Section 4(4), Code, 1931, as amended, a claimant shall be disqualified for unemployment benefits for a "week in which his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which he was last employed, * * *."

It is not questioned by either party that "a labor dispute" existed within the meaning of the statute during the period of the claimants' unemployment. The trial examiner decided, the board of review affirmed and the circuit court reaffirmed that the facts of the case established the existence of a labor dispute between the company and the union. Neither party has questioned that determination. "Where there is an existing contract between a group of employers and their employees, covering wages, terms, and conditions of employment, which is about to expire, negotiations in re-

spect to entering into a new contract, or the continuance or modification of the old, in which differences of opinion arise, and there is a failure to agree thereon, from which disagreement unemployment results, a labor dispute is thereby created, within the meaning of subsection 4 of Section 4, Article 6, of Chapter 1, Acts of the Legislature, Second Extraordinary Session, 1936, * * *." *Miners in General Group et al.* v. *Hix, Clerk,* 123 W. Va. 637, pt. 2 syl., 17 S. E. 2d 810. See also *Homer Laughlin China Co.* v. *Hix,* 128 W. Va. 613, 624, 37 S. E. 2d 649, 655.

Apparently it is agreed by counsel for the respective parties that in a case such as this the law makes no distinction between a stoppage of work caused by a strike and a stoppage of work caused by a lockout. Courts of other states have consistently held, under similar statutory language, that it is immaterial whether the stoppage of work is caused by a strike or by a lockout. *Bankston Creek Colliers, Inc.* v. *Gordon,* 399 Ill. 291, 77 N. E. 2d 670; *Adkins* v. *Indiana Employment Security Division,* 117 Ind. App. 132, 70 N. E. 2d 31; *Schoenwiesner* v. *Board of Review,* 44 N. J. Super. 377, 130 A. 2d 648; *Midvale Co.* v. *Unemployment Compensation Board of Review,* 165 Pa. Super. 359, 67 A. 2d 380. In the case of *In re North River Logging Co.,* 15 Wash. 2d 204, 130 P. 2d 64, at page 66, the court stated: "Viewed in its social and economic aspects, the lockout is a weapon in the hands of the employers which is a counterpart of the weapon of strike held by the workers. 'A strike is a cessation of work by employees in an effort to get for the employees more desirable terms. A lockout is a cessation of the furnishing of work to employees in an effort to get for the employer more desirable terms.' " To the same effect, see *Magner* v. *Kinney,* 141 Neb. 122, 2 N. W. 2d 689. The board of review aptly stated: "Lockout or strike are only two sides of the same coin." It appears clear, therefore, that a lockout is but a counterpart or correlate of a strike in a situation such as this.

Inasmuch as it appears clearly that "a labor dispute" existed, the ultimate and primary question presented for decision is whether the labor dispute and the consequent partial

lockout resulted in "a stoppage of work" within the meaning of the statute. It is not required that there be a complete cessation of all activities of the employer to constitute a "stoppage of work." The general rule is that the term "stoppage of work" as used in statutes of this nature is held to refer to the employer's plant operations rather than to the employees' labor, and to mean a substantial curtailment of work or operations in the employing establishment rather than a mere cessation of work by the claimants. 81 C.J.S., Social Security and Public Welfare, Section 190, page 283. "It is generally agreed that a stoppage of work commences at the place of employment when a definite or substantial curtailment of operations occurs * * *. The stoppage need not be complete and it will suffice if there has been a substantial curtailment of operations." 28 A.L.R. 2d 322, Anno. To the same effect, see *Ferst, Ltd.* v. *Huiet,* 78 Ga. App. 855, 52 S. E. 2d 336; *Lawrence Baking Co.* v. *Unemployment Comp. Commission,* 308 Mich. 198, 13 N. W. 2d 260, 154 A.L.R. 660; *Magner* v. *Kinney,* 141 Neb. 122, 2 N. W. 2d 689; *Monsanto Chemical Co.* v. *Thornbrough,* 229 Ark. 362, 314 S. W. 2d 493; *Sakrison* v. *Pierce,* 66 Ariz. 162, 185 P. 2d 528, 71, 73 A. 2d 262; *Bilodeau* v. *Maine Employment Security Commission,* 153 Me. 254, 136 A. 2d 522; *Producers Produce Co.* v. *Industrial Commission of Missouri,* (Mo. App.) 281 S. W. 2d 619, *Gerber* v. *Board of Review,* 36 N. J. Super. 322, 115 A. 2d 575. In the opening paragraph of the opinion in the case of *Homer Laughlin China Co.* v. *Hix,* 128 W. Va. 613, 37 S. E. 2d 649, the Court spoke of "a stoppage of work at the factory of the company."

Apparently counsel for the respective parties are in substantial agreement concerning the correctness of the legal propositions stated previously herein. It is perhaps accurate to conclude, therefore, that the issue is narrowed to the precise question whether the proof discloses that the employer's operations were substantially curtailed by the partial lockout which resulted from the labor dispute.

As has been stated previously, the witness' estimate of 80 per cent curtailment in the overall activities or operations of the company during the period of the lockout apparently

was based merely on the proportionate relation of the number of employees affected by the lockout to the total number of employees of the company in all categories, including supervisory, managerial, and clerical employees. The testimony tending to show curtailment or cessation of activities in thirteen categories during the period of the lockout is summarized in the brief of counsel for the gas company as follows: (1) All 79 of the company's hourly paid employees ceased to work on July 29, 1960, and did not work during the entire period extending to August 26. (2) During this entire period no work on periodic meter changes was performed. (3) During this entire period, no work of handling "routine service orders" was performed. (4) During this entire period no domestic meter reading work was performed. (5) During this entire period no work on constructing new line extensions or on the renewal of old lines was performed. (6) During this entire period (with the execption of one day), no work on installing new service lines was performed. (7) During this entire period no work of making meter tests was performed. (8) During this entire period no work of providing truck transportation, no routine inspection work, no work on installation of parts on customers' appliances, and no work of house line plumbing installation inspections, was performed. (9) All maintenance and building work ceased during the entire period. (10) All engineering and design work ceased. Notwithstanding such testimony, we believe it is fair to say that there was no substantial showing of unfulfilled demands or unfulfilled requirements in such categories during the lockout period; and, as has been stated previously, there was no showing of an accumulated backlog of work or services in such categories sufficient in volume or nature to require employment of additional personnel or to require overtime employment on the part of the regular employees after normal operations were resumed.

A determination of the existence or nonexistence of a stoppage of work in a case of this nature must necessarily depend upon the facts of each case. It cannot be determined solely on the basis of the proportionate number of employees affected. It is conceivable that in some situations a strike

or lockout affecting relatively few employees would produce a stoppage of work if such men were employed in the performance of duties of such vital nature that their unemployment would result in a substantial curtailment of the normal overall activities or operations of the employer. On the other hand, in other situations the unemployment of a proportionately greater number of employees might have no substantial effect on the normal activities of the employer. In some situations, a substantial curtailment of work in a single category or department of the employer's operations might be of such a vital nature as to result in a substantial curtailment of the employer's overall activities if all categories or departments were of an interdependent nature; while, conceivably, in another and different situation, a complete cessation of work in a single category or department of some incidental or minor nature might produce no appreciable curtailment of the overall operations of the employer.

In *Homer Laughlin China Co. v. Hix,* 128 W. Va. 613, 37 S. E. 2d 649, the Court in the first point of the syllabus, stated: "A strike, by employees of the operator of a factory, which results in curtailment to the extent of approximately seventy-five per cent of the production of one of its departments, * * * creates a stoppage of work * * *." The question pertaining to facts essential to constitute a stoppage of work seems not to have been a serious issue and was, therefore, not discussed at length in that case, but from the opinion it appears that unemployment in that case curtailed production in the employer's kiln firing department to the extent of seventy to seventy-five per cent.

The case of *Monsanto Chemical Co. v. Thornbrough,* 229 Ark. 362, 314 S. W. 2d 493, involved a strike by 339 employees, 232 of whom filed claims for unemployment benefits. The strike became effective March 2, 1956, and as a result thereof, Monsanto Chemical Company's plant was idle until April 27, when the employer resumed at least partial operations by ultilizing the services of 91 supervisory employees. The claims involved a three-week period ending June 8, at which time the labor dispute was settled and the striking workers returned to their jobs. It was established

without dispute that during the three-week period the employer "did not operate one of its catalytic cracking stills and did not operate its alkylation plant." In upholding an award of benefits to the claimants, the court stated: "Here the proof shows that, in terms of barrels, Monsanto's output in May and June was roughly the equivalent of normal production. That some of the stills were not operating does not show conclusively that the stoppage continued to exist, in view of the admission that it was normal for some stills to be shut down."

*Producers Produce Co. v. Industrial Commission of Missouri,* (Mo. App.) 281 S. W. 2d 619, was a case in which the employer was engaged primarily in the processing of poultry and eggs, with minor operations in hides and wool. As a result of a labor dispute concerning wages, a strike was called on June 3, 1950, involving union members, including the claimants of unemployment benefits. A complete stoppage of work resulted for three days. While the strike was still in progress, the company employed other workmen. The court upheld a prior finding that there was no stoppage of work for a period during which the employer resumed substantially normal operations by utilizing such new employees. The court stated: "It is admitted here that there was a labor dispute. There was substantial evidence to support the Commission's findings that after the week ending July 8th, there was no longer a substantial diminution of the activities, production or service at the plant of the employing unit. So, it is clear from the plain wording of the statute that there was no stoppage of work due to a labor dispute after the factory substantially resumed its operations. Yet, the strike was not settled. Clearly the meaning of the phrase 'stoppage of work' as used in the statutes was not intended by the legislature to be synonymous with the word 'strike' ".

*Sakrison v. Pierce,* 66 Ariz. 162, 185 P. 2d 528, involved a strike by employees of a hotel, as a consequence of which the hotel was required to make a drastic curtailment of its operations. The case involved claims of striking employees for unemployment benefits for a period during which "the

hotel had fully resumed operations by successfully replacing plaintiffs with other employees." The court held: "By any reasonable interpretation of this section, and consonant with the weight of authority, the fact that they confined their claims to a period after the hotel had resumed normal operations saves them from the effects of our disqualification clause. Should a different policy be desired, the relief lies with the legislature, and not with this court."

It is difficult to find precise precedents to guide us in cases involving public utilities such as the employer in the case before us. *Mountain States Telephone & Telegraph Co.* v. *Sakrison*, 71 Ariz. 219, 225 P. 2d 707, involved a strike of employees of a telephone company who asserted claims for unemployment benefits. During the period of the strike, curtailed operations of the company were maintained largely by supervisory personnel who were not involved in the strike. That case, however, involved a much clearer case for judicial determination of "a stoppage of work" than does the present case. Pertinent facts stated by the court were as follows: "The company's revenue, statewide, dropped 66.7%, i.e., down to 33.3% of normal. Although certain exchanges had dial instruments and local service was practically normal at those exchanges, e.g., Phoenix, the long distance business was, of course, affected at all exchanges, and substantially reduced the overall revenue. Statewide the local exchange revenues dropped from a normal of $479,115 to $282,268 during the strike period, or a reduction of 40.9%. Long distance (toll) revenues dropped from a normal of $690,428 to $106,814, or a reduction of 84.5%. The overall figures showed total normal revenues from both exchange service and toll service to be $1,169,543, which was reduced to $389,082, or a reduction as stated above to 33.3% of normal." The court made the following statement which we deem pertinent to our present case, especially since that case, as the present case, involved a public utility, a portion of whose activities were mechanical, operating without the intervention of human effort: "The uncontroverted evidence discloses that three primary factors were properly considered by the commission and approved by the court

in measuring the degree of curtailment of the employer's operations resulting from the strike. These were: (1) revenue, (2) services rendered, and (3) employment. All three showed a marked decrease as a result of the strike."

Counsel for the gas company insist that both the board of review and the circuit court improperly applied in this case a rule that a stoppage of work means a substantial curtailment of "production", which rule is applied properly in case of an employer engaged in the production of units or items of tangible property such as china, barrels of chemicals, shoes or coal; that the gas company in this case is not engaged in the production of items of tangible property, but rather it is engaged primarily in furnishing service to the public. Counsel for the gas company further point out that its normal service of supplying gas to consumers will continue without substantial curtailment for a time, such as the period of approximately three weeks with which we are concerned in this case, somewhat on an automatic or mechanical basis, notwithstanding the fact that a substantial number of employees may not be working meantime. In summary, counsel for the employer insist that the board of review and the circuit court have made a new and different rule as it relates to the utility in this case. We are unable to accept that contention. On the contrary, our view is that the law has been written to apply alike to employers of all types and the gas company is asking that we apply a different or exceptional rule as to its operations. Our statutes do not set forth an exception in case of utilities such as the gas company in this case, and they make no provision for a different rule in case of employers of this nature. It may be that there should be a different rule or standard in case of a natural gas public utility, the operations of which are in some measure of an automatic or a mechanical nature, without the intervention of human effort; but we believe that, if a rule or exception of this nature is desirable, the appeal must be to the legislature.

Apparently it is by almost universal acceptance that a stoppage of work is held to mean a substantial curtailment of the normal operations of the employer. We are aware of

no precedent which would authorize the making of an exception in case of a public utility supplying natural gas to consumers and our statutes make no such exception. "Unemployment compensation statutes, being remedial in nature, should be liberally construed to achieve the benign purposes intended to the full extent thereof." *Davis* v. *Hix,* 140 W. Va. 398, pt. 6 syl., 84 S. E. 2d 404.

Section 21, Article 7, Chapter 21A, Code, 1931, as amended, provides that the findings of fact of the board of review "shall have like weight to that accorded to the findings of fact of a trial chancellor or judge in equity procedure." Findings of fact made by a trial judge sitting without a jury are likewise entitled to peculiar weight on appeal to this Court, though the rule as it relates to the judge of the circuit court would lack some of its usual force in this case because no witnesses appeared in person before him. We believe, however, and accordingly hold that there is in this case no material dispute in the evidence relating to the question of a stoppage of work and that, therefore, the question becomes one of law. *Mountain States Telephone & Telegraph Co.* v. *Sakrison,* 71 Ariz. 219, 225 P. 2d 707.

For reasons stated the judgment of the Circuit Court of Kanawha County is affirmed.

*Affirmed.*