IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2021 Term

_____

No. 20-0486

_____

FILED
**November 5, 2021**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

CONSTELLIUM ROLLED PRODUCTS
RAVENSWOOD, LLC,
Petitioner Below, Petitioner

v.

EARL B. COOPER, et al., and
WORKFORCE WEST VIRGINIA BOARD OF REVIEW,
Respondents Below, Respondent

_____

Appeal from the Circuit Court of Kanawha County
The Honorable Jennifer F. Bailey, Judge
Civil Action Nos. 13-AA-44 and 13-AA-45

REVERSED IN PART AND AFFIRMED IN PART
AND REMANDED

_____

Submitted: September 15, 2021
Filed: November 5, 2021

Ancil G. Ramey, Esq.
Christopher L. Slaughter, Esq.
Steptoe & Johnson PLLC
Huntington, West Virginia
Rodney L. Bean, Esq.
Steptoe & Johnson PLLC
Morgantown, West Virginia

Thomas P. Maroney, Esq.
Patrick K. Maroney, Esq.
Maroney, Williams, Weaver & Pancake PLLC
Charleston, West Virginia
Counsel for Respondents-Claimants

Counsel for Petitioner

Patrick Morrisey
Attorney General
Charleston, West Virginia
Counsel for Respondent Workforce West
Virginia Board of Review

JUSTICE WALKER delivered the Opinion of the Court.

JUSTICE WOOTON dissents and reserves the right to file a separate opinion.

SYLLABUS BY THE COURT

1. "The findings of fact of the Board of Review of the West Virginia Department of Employment Security are entitled to substantial deference unless a reviewing court believes the findings are clearly wrong. If the question on review is one purely of law, no deference is given and the standard of judicial review by the court is *de novo*." Syllabus Point 3, *Adkins v. Gatson*, 192 W. Va. 561, 453 S.E.2d 395 (1994).

2. "The term 'stoppage of work', within the meaning of the unemployment compensation statutes of this state refers to the employer's operations rather than to a mere cessation of employment by claimants of benefits under the provisions of such statutes; and, in order that employees may be disqualified from receiving unemployment compensation benefits because of 'a stoppage of work' resulting from a labor dispute, it must appear that there has resulted a substantial curtailment of the employer's normal operations." Syllabus Point 2, *Cumberland & Allegheny Gas Co. v. Hatcher*, 147 W. Va. 630, 130 S.E.2d 115 (1963), *overruled on other grounds by Lee-Norse Co. v. Rutledge*, 170 W. Va. 162, 291 S.E.2d 477 (1982).

3. Syllabus Point 1 of *Homer Laughlin China Co. v. Hix*, 128 W. Va. 613, 37 S.E.2d 649 (1946), does not require an employer to show at least a 75-percent curtailment in its normal operations in order to establish a "work stoppage," for purposes of West Virginia Code § 21A-6-3(4) (2012).

4.    "W.Va.Code, 21A–6–3(4) (1984), disqualifies employees from receiving unemployment compensation benefits if they are involved in 'a work stoppage incident to a labor dispute,' unless they can satisfy one of three statutory exceptions: (1) the employees are 'required to accept wages, hours or conditions of employment substantially less favorable than those prevailing for similar work in the locality'; (2) the employees 'are denied the right of collective bargaining under generally prevailing conditions'; or (3) 'an employer shuts down his plant or operation or dismisses his employees in order to force wage reduction, changes in hours or working conditions.'" Syllabus Point 1, *Roberts v. Gatson*, 182 W. Va. 764, 392 S.E.2d 204 (1990).

5.    "A refusal to engage in the collective bargaining process or to negotiate on those mandatory subjects that traditionally form the basis of the collective bargaining agreement so frustrates the process as to constitute a denial of the right of collective bargaining under W.Va.Code, 21A–6–3(4) (1984)." Syllabus Point 2, *Roberts v. Gatson*, 182 W. Va. 764, 392 S.E.2d 204 (1990).

WALKER, Justice:

In 2012, Constellium Rolled Products of Ravenswood, LLC employed 860 workers at its production plant, 680 of whom were represented by United Steelworkers Local 5668. In the spring and summer of that year, representatives of Constellium and the Union met twenty-six times to negotiate a new collective bargaining agreement. By August 5, 2012, two contract extensions had come and gone and Constellium and the Union still could not come to terms. So, Earl B. Cooper and other Union members employed at the plant (Claimants) stopped working and went on strike. The strike ended a few weeks later and Claimants applied for unemployment compensation benefits. Constellium contested the applications under West Virginia Code § 21A-6-3(4) (2012) (labor dispute provision).[1] A Labor Dispute Tribunal decided that Claimants were not disqualified for benefits under that provision. The Board of Review affirmed that decision, and the Circuit Court of Kanawha County affirmed the Board.

Constellium now argues that the lower tribunals erroneously held that Claimants were not disqualified for unemployment compensation benefits under the labor dispute provision. We agree. The facts found by the lower tribunals clearly demonstrate that a stoppage of work occurred at Constellium's plant during the 2012 labor dispute, and

---

[1] We apply the version of the statute in effect at the time of the strike. The statutory language is set out, below, in section III.A. The Legislature rewrote the labor dispute provision in 2017. 2017 W. Va. Acts 245 (eff. July 2, 2017).

those tribunals clearly erred by concluding otherwise. And, we find no error in the lower tribunals' conclusions that Claimants have not satisfied the exceptions to disqualification under the labor dispute provision and that the provision is not preempted by federal labor law. For those reasons, we reverse in part and affirm in part the Circuit Court of Kanawha County's order of June 12, 2020, and remand this case for entry of an order denying Claimants' applications for unemployment compensation benefits.

## I.    FACTUAL AND PROCEDURAL HISTORY

Constellium produced aluminum plate and coil products at its Ravenswood plant in 2012. Plate is used primarily in the aerospace industry while the coil goes to a more diverse customer base. The Union represented the hourly workers at the Ravenswood plant, who then accounted for approximately 80 percent of the Ravenswood plant's workforce (680 employees out of 860, total).

In 2010, the Union and Constellium had entered into a two-year collective bargaining agreement. That agreement was set to expire in July 2012,[2] so the Union and Constellium began negotiations for a new agreement in May 2012 and met over twenty times between May and August 2012. A dispute over healthcare pervaded the negotiation of economic contract terms.[3] Constellium worked to walk back the first-dollar health

---

[2] The 2010 agreement was extended twice after its expiration in July 2012.

[3] "Economic" terms include health care, wages, bonuses, show allowances, extra vacation days, and holidays.

coverage workers had enjoyed under the 2010 agreement and to put a medical necessity clause into the agreement.[4] The Union opposed both changes. Constellium and the Union could not come to terms, so union members went on strike at midnight on August 5, 2012.[5]

Constellium continued to operate the plant during the strike by shifting approximately 180 salaried employees from their usual assignments to bargaining unit work. Those salaried employees performed bargaining unit jobs six or seven days a week during the strike, in two, twelve-hour shifts, so that Constellium continued to produce and ship plate and coil, and generate revenue during the strike, although at levels far below normal. Negotiations on health and welfare benefits continued during the strike. Eventually, Constellium proposed revisions to the medical necessity clause that found traction. Union members accepted the revised proposal on September 20, 2012, and returned to work four days later.

Claimants applied for unemployment compensation benefits for the period of the labor dispute. Constellium contested the applications, and the dispute was referred

---

[4] The 2010 agreement did not contain the medical necessity clause but the third-party administrator of Constellium's health plan implemented the requirement, anyway. Bargaining unit members successfully grieved the denial of medical treatment due to the medical necessity requirement while the 2010 agreement was in effect.

[5] The parties do not contest that the strike is a "labor dispute" for purposes of § 21A-6-3(4).

to a three-member Labor Dispute Tribunal.[6] During the pre-hearing conference, the Tribunal granted-in-part Constellium's motion to quash a subpoena duces tecum that Claimants had previously caused to be served upon representatives of Constellium.[7] That subpoena sought, among other things, "All communications, memos, emails, text messages, videos and pictures between [Constellium] employees or its agents, including [a Constellium parent entity], regarding union members of [Constellium], regarding the labor dispute between [the Union] and [Constellium]."[8] The Tribunal found that request plus two similar ones to be "vague, general and unnecessarily cumbersome."

---

[6] *See* W. Va. Code § 21A-7-4(c) (1994) (directing deputy to investigate all claims for unemployment compensation benefits and requiring that, "[i]f it appears from the deputy's investigation and from all of the information before him, that a claim relates to a labor dispute or to a disqualification under [§ 21A-6-3(4)], the claim shall be transferred to the board for full hearing and initial determination by an appeal tribunal").

[7] *See* W. Va. Code § 21A-4-12 (1936) ("The board, appeal tribunal, or examiner shall have the power to issue subpoenas for the production of persons and papers in all proceedings within their jurisdiction.").

[8] Specifically, Claimants sought production of:

> 1. All communications, memos, emails, text messages, videos and pictures between Constellium Rolled Products Ravenswood, LLC employees or its agents, including AFIMAC, regarding union members of Constellium Rolled Products Ravenswood, LLC, regarding the labor dispute between United Steelworkers ("USW") Local Union 5668 and Constellium Rolled Products Ravenswood, LLC.

> 2. All internal communications, memos, emails, text messages or videos between Constellium Rolled Products Ravenswood, LLC between union and non-union employees regarding contract negotiations, replacement workers, or any

4

The Tribunal conducted a two-day evidentiary hearing in early November 2012.[9] Constellium presented testimony and documents to support its position that a stoppage of work had occurred at the Ravenswood plant during the August-September 2012 labor dispute.[10] Claimants offered evidence to support their position that Constellium had denied them their right of collective bargaining by insisting on including the medical

other information regarding the formation of contract proposals for a collective bargaining agreement between Constellium Rolled Products Ravenswood, LLC and USW Local 5668.

3.     All communications, memos, emails, text messages or videos between Constellium Rolled Products Ravenswood, LLC employees and its agents or any of its affiliates, and Appollo Global Management, LLC, or any of its affiliates, including Appollo Investment Fund VII, LP, Rio Tinto, Funds Strategique d'Investment FSI, Constellium France SAS, Constellium Switzerland AG, and other companies, affiliates or agents, regarding the proposed collective bargaining agreement between Constellium Rolled Products Ravenswood, LLC and USW Local 5668, including the use of replacement workers.

[9] *See* W. Va. Code § 21A-7-7a (1972) (stating that "[u]pon transfer to the board of a case relating to a labor dispute or to disqualification under [§ 21A-6-3(4)], for hearing and initial determination by an appeal tribunal, the parties shall be entitled to a full and complete hearing and opportunity to present evidence before an appeal tribunal").

[10] *See Peery v. Rutledge*, 177 W. Va. 548, 552, 355 S.E.2d 41, 45 (1987) (stating general rule that "the burden of persuasion is upon the former employer to demonstrate by the preponderance of the evidence that the claimant's conduct falls within a disqualifying provision of the unemployment compensation statute").

necessity clause in the 2012 agreement and by putting leaders of a parent company located in Paris, France, in charge of bargaining on economic terms.[11]

On December 14, 2012, the Tribunal decided that the Claimants were not disqualified for unemployment compensation benefits because a stoppage of work had not occurred at Constellium's Ravenswood plant due to the strike. The Tribunal found that operations had continued at the plant during the strike, albeit by the efforts of salaried employees working bargaining unit jobs. The Tribunal found that decreases in production, product shipped, and revenue did not indicate that Constellium's normal operations had been "substantially curtailed," so that no stoppage of work had occurred during the labor dispute and Claimants were not disqualified for unemployment compensation benefits. The Tribunal then analyzed and rejected the parties' remaining arguments for purposes of appellate review, including arguments put forth by Claimants to counter their disqualification from benefits, had the Tribunal found in Constellium's favor. The Board of Review affirmed the Tribunal's decision in February 2013. The Circuit Court of

---

[11] *See* W. Va. Code § 21A-6-3(4) (2012) (setting out four exceptions to disqualification for unemployment compensation benefits under labor dispute provision). Below, Claimants also asserted that they had been required to accept terms of employment substantially less favorable than those prevalent in the area. Claimants do not pursue that theory on appeal.

6

Kanawha County entered an order affirming the Board's order affirming the Tribunal's decision on June 12, 2020.[12]

## II.  STANDARD OF REVIEW

Our standard of review of decisions by the Board of Review is well-settled:

> The findings of fact of the Board of Review of the West Virginia Department of Employment Security are entitled to substantial deference unless a reviewing court believes the findings are clearly wrong. If the question on review is one purely of law, no deference is given and the standard of judicial review by the court is *de novo*.[13]

## III.  DISCUSSION

We first consider Constellium's appeal of the lower tribunals' conclusion that Claimants are not disqualified for unemployment compensation benefits because a stoppage of work did not occur at the Ravenswood plant in 2012.  We then take up

---

[12] In September 2013, the circuit court consolidated Constellium's appeal and Claimants' "limited appeal" of the Board of Review's decision into a single proceeding. Delays plagued the consolidated cases.  Briefing before the circuit court concluded in December 2013.  Claimants filed proposed findings of fact and conclusions of law with their reply.  Constellium did not supply the court with a proposed order until 2015.  In 2019, Constellium petitioned this Court for relief in mandamus to compel the circuit court to rule on the parties' appeal and "limited appeal."  This Court issued a rule to show cause in January 2020.  The circuit court entered its final order affirming the Board of Review's order adopting the findings of the Labor Dispute Tribunal on June 12, 2020.  This Court then dismissed Constellium's petition for mandamus relief as moot later that month.

[13] Syl. Pt. 3, *Adkins v. Gatson*, 192 W. Va. 561, 453 S.E.2d 395 (1994).

Claimants' cross-appeal. Finally, Constellium's federal preemption argument is briefly considered.

## A. Disqualification for Benefits

West Virginia Code § 21A-6-3(4) (2012) controls the determination of whether Claimants were properly paid unemployment compensation benefits for the period of the 2012 strike. Under this statute, also called the labor dispute provision, a claimant "is disqualified for benefits . . . [f]or a week in which his or her total or partial unemployment is due to a *stoppage of work* which exists because of a labor dispute at the factory, establishment or other premises at which he or she was last employed."[14] This Court has explained that for the purposes of the labor dispute provision, a "stoppage of work" does not mean that the lights must be turned off and the doors to the factory locked to trigger disqualification. Instead, the analysis is fact specific and turns on whether there is a substantial curtailment of normal operations:

> [t]he term "stoppage of work", within the meaning of the unemployment compensation statutes of this state refers to the employer's operations rather than to a mere cessation of employment by claimants of benefits under the provisions of such statutes; and, in order that employees may be disqualified from receiving unemployment compensation benefits because of 'a stoppage of work' resulting from a labor dispute, it must

---

[14] W. Va. Code § 21A-6-3(4) (2012) (emphasis added).

8

appear that there has resulted a *substantial curtailment of the employer's normal operations*.[15]

"A determination of the existence or nonexistence of a stoppage of work in a case of this nature must necessarily depend upon the facts of each case."[16]

Constellium argues that the Tribunal erroneously found that a stoppage of work did not occur at the Ravenswood plant during the 2012 labor dispute. Constellium objects that the Board (1) ignored the fact that salaried workers reassigned to bargaining unit jobs were unable to complete their regular, assigned tasks during the labor dispute; (2) mismeasured the impact of the strike upon Constellium's normal operations by comparing output during the strike to an incomparable, historical period; and (3) failed to account for

---

[15] Syl. Pt. 2, *Cumberland & Allegheny Gas Co. v. Hatcher*, 147 W. Va. 630, 130 S.E.2d 115 (1963) (emphasis added), *overruled on other grounds by Lee-Norse Co. v. Rutledge*, 170 W. Va. 162, 291 S.E.2d 477 (1982).

As noted above, the Legislature rewrote the labor dispute provision in 2017. In part, the 2017 amendments to W. Va. Code § 21A-6-3(4) provide that,

> Upon the determination of the facts by the commissioner, an individual is disqualified for benefits . . . [f]or any week or portion thereof in which he or she did not work as a result of: (a) A strike or other bona fide labor dispute which caused him or her to leave or lose his or her employment; (b) . . . the operation of a facility by non-striking employees of the company, contractors or other personnel is not a reason to grant employees of the company on strike unemployment compensation benefit payments.

The Legislature made two stylistic changes to the labor dispute provision in 2020. 2020 W. Va. Acts 203.

[16] *Cumberland & Allegheny Gas Co.*, 147 W. Va. at 639, 130 S.E.2d at 121.

9

those days during the months of August and September 2012 when the plant ran at full capacity. Constellium also argues that even if one accepts the Board's arguably flawed findings as to Constellium's output levels during the 2012 labor dispute, those findings still show that the labor dispute substantially curtailed its normal operations.

Claimants respond that the meaning of "work stoppage" in West Virginia is settled, and that this Court has held that a substantial curtailment of operations would be in the 75- to 80-percent range. Claimants contend that the Tribunal carefully and thoroughly interpreted the production, shipping, and revenue figures offered by both parties to reach its factual findings regarding the impact of the labor dispute on Constellium's normal operations. According to Claimants, those findings do not support a conclusion that Constellium's normal operations were substantially curtailed due to the labor dispute because they fall well short of the 75- to 80-percent threshold adopted by this Court. Finally, Claimants attempt to distinguish out-of-state cases cited by Constellium in support of its argument that the Tribunal improperly ignored evidence regarding the impact of the labor dispute upon non-output metrics of Constellium's performance during the strike.

### (1)    The Tribunal's Calculations

We begin with Constellium's contention that the Tribunal erroneously calculated the rates at which the 2012 strike impacted the Company's "normal operations." The Tribunal used prestrike rates of production, shipping, and revenues to describe Constellium's normal operations. So, broadly, the Tribunal compared Constellium's rates

10

of production, shipping, and revenues during the strike to those before the strike to determine the rate at which the strike curtailed Constellium's normal operations. Constellium argues that the Tribunal erred when it relied, in part, on Claimants' proposed lookback period of roughly two-and-a-half years to establish Constellium's normal operations, which, in turn resulted in the erroneous determination of the impact of the strike upon them.

Constellium asserts that the appropriate period of comparison was February to July 2012. Those were "up" months, according to Constellium, and it expected strike-months August and September 2012 to be "up" months, too. Constellium argues that the Tribunal was bound to compare up months to up months, so comparison of August and September 2012 rates of production, shipping, and revenues to those rates in the five months before provides the accurate rate of curtailment of its operations due to the strike.

Faced with this argument, the circuit court found that it was "not clearly wrong or unreasonable to conclude that a longer, more comprehensive time frame captures a more reliable picture of what is 'normal business' and more accurately reflects the cyclical nature of Constellium Ravenswood's business." Like the circuit court, we see nothing clearly wrong in the Tribunal's effort to account for the admitted variances in Constellium's business environment by relying, in part, on a lengthier timeframe to assess the company's normal operations. The Tribunal heard testimony that supported Constellium's position that Claimants' lengthier lookback period was incomparable to the

11

company's anticipated performance in August and September 2012. But that same testimony could also have led the Tribunal to conclude that Constellium's five-month comparison period was too short to represent the variability of the company's operations. On this issue, we are reluctant to second-guess the Tribunal's assessment of the testimony and its choice to rely in part on Claimants' lengthier lookback period to determine Constellium's normal operations.

We say "in part" because as the Tribunal explained, "[t]o calculate the average monthly percentages of [Constellium's] normal business activity, [it] gave similar weight to the claimant's recommended time period of January 2010/July 2012 and the employer's recommended time period of March 2012/July 2012." The Tribunal did not adopt Claimants' position to the exclusion of Constellium's; it considered both. Again, we see nothing clearly wrong in that approach and for the same reason articulated by the circuit court:

> [T]he ALJ Tribunal averaged the output values during the time frames proposed by both parties to determine an average between the two positions. While there may be merit in choosing a different time frame for other types of comparisons, the time frames chosen by the ALJ Tribunal for comparison to the issues raised in these proceedings were reasonable, and likewise took into account the positions of both parties.

Constellium also argues that the Tribunal erred by failing to account for the eleven, non-strike days during the months of August and September 2012 during which Constellium operated at full capacity (approximately 18 percent of the days in those

months). Had that step been taken, Constellium asserts, its comparative rates of strike-time production, shipping, and revenue would have been lower (and more accurate) than those ultimately found by the Tribunal. Again, we see nothing clearly wrong in the Tribunal's calculation of Constellium's performance during the strike at the month level, rather than day-by-day. As Constellium acknowledges, daily output metrics were not available at the administrative hearing. The Tribunal declined to approximate the daily performance metrics for August and September—to, in its words, "extrapolate, assume, estimate and guess the amount, difference, and significance of the strike and non-strike business activity in the August/September 2012 period[.]" There are multiple ways the Tribunal could have sliced and diced the month-level measurements to arrive at daily output levels. The circuit court outlines one approach in its order, Constellium advocates a different one its brief, and others are certainly available. We do not fault the Tribunal for staying out of the fray, given the numerous possible approaches. Ultimately, we cannot say that the Tribunal's calculations are clearly wrong, so we leave them alone.

### (2) Substantial Curtailment

Two Constellium arguments remain: that the Tribunal overlooked the curtailment of non-output related activities during the strike[17] and that even the Tribunal's

---

[17] Given the ensuing analysis of the Tribunal's finding of no work stoppage, we do not address Constellium's first assignment of error—that contrary to the Tribunal's order, a stoppage of work did occur during the 2012 strike because the labor dispute affected nearly 80 percent of the company's employees and Constellium's salaried employees were unable to complete their own, regularly assigned tasks during the strike because they were reassigned to bargaining unit positions.

erroneously calculated output measurements show a substantial curtailment of Constellium's normal operations due to the 2012 labor dispute. Claimants respond that the law regarding substantial curtailment is well-settled. *Cumberland & Allegheny Gas Co. v. Hatcher*[18] and *Homer Laughlin China Co. v. Hix*,[19] they represent, establish a rule that an employer demonstrates substantial curtailment by showing a 75 to 80 percent decrease in output, and Constellium did not do that, here.

We first dispel the notion that *Cumberland & Allegheny* and *Homer Laughlin* establish that an employer's normal operations must be curtailed by at least 75 percent to establish a stoppage of work under § 21A-6-3(4). To be clear: *Cumberland & Allegheny* and *Homer Laughlin* do not establish a 75-percent threshold. In *Cumberland & Allegheny*, this Court considered whether a gas utility's normal operations were substantially curtailed when 80 percent of the utility's employees went on strike but the amount of gas supplied and sold by the utility did not fall.[20] This Court found that the utility's normal operations were not substantially curtailed due to the labor dispute, apparently based on the utility's steady production and in spite of the fact that only 20 percent of the workforce remained on the job.[21]

---

[18] *Cumberland & Allegheny*, 147 W. Va. at 630, 130 S.E.2d at 115.

[19] *Homer Laughlin China Co. v. Hix*, 128 W. Va. 613, 37 S.E.2d 649 (1946).

[20] *Cumberland & Allegheny*, 147 W. Va. at 636, 638, 130 S.E.2d at 119.

[21] *Id*. at 639, 643−44, 130 S.E.2d at 123.

14

Notably, in *Cumberland & Allegheny* this Court did not originate a syllabus point enshrining an 80-percent reduction in an employer's normal operations as a substantial curtailment of those operations. Instead, we held that "in order that employees may be disqualified from receiving unemployment compensation benefits because of 'a stoppage of work' resulting from a labor dispute, it must appear that there has resulted a substantial curtailment of the employer's normal operations," and left it at that.[22]

*Homer Laughlin v. Hix* is not a 75-percent silver bullet, either. In *Homer Laughlin*, this Court held that,

> A strike, by employees of the operator of a factory, which results in curtailment to the extent of approximately seventy-five per cent of the production of one of its departments, and arises from breach of a wage contract by the striking employees, creates a stoppage of work which exists because of a labor dispute, within the meaning of the statute, Subsection 4, Section 4, Article 6, Chapter 76, Acts of the Legislature, 1943.[23]

That syllabus point does not say that *only* a 75-percent curtailment of production establishes a stoppage of work, an important distinction that left space for this directive seventeen years later in *Cumberland & Allegheny*: "[a] determination of the existence or nonexistence of a stoppage of work in a case of this nature must necessarily

---

[22] Syl. Pt. 2, in part, *id*. at 630, 130 S.E.2d at 115.

[23] Syl. Pt. 1, *Homer Laughlin*, 128 W. Va. at 613, 37 S.E.2d at 649.

15

depend upon the facts of each case."[24] So, to put any confusion to rest, we now hold that Syllabus Point 1 of *Homer Laughlin China Co. v. Hix*, 128 W. Va. 613, 37 S.E.2d 649 (1946), does not require an employer to show at least a 75-percent curtailment in its normal operations in order to establish a "work stoppage," for purposes of West Virginia Code § 21A-6-3(4) (2012).

*Cumberland & Allegheny* demonstrates that the determination of whether a stoppage of work due to a labor dispute has occurred does not have to be made in a vacuum. In that case, we surveyed decisions from Arkansas, Missouri, and Arizona before determining that no work stoppage had occurred; likewise, it is appropriate in this case to look to other states for guidance. And when we do that, we see that no court has established a hard-and-fast rule that a certain percent reduction in the employer's normal operations amounts to a *substantial* curtailment. We will not make that rule, either, given the fact-intensive nature of the substantial curtailment inquiry. But in reviewing the facts of the cases before them, we cannot help but notice that other courts have recognized that a 20- to 30-percent reduction in production would seem to be the "critical breaking point . . . sufficient to establish a stoppage."[25] These include Missouri (decrease in production by

---

[24] *Cumberland & Allegheny*, 147 W. Va. at 639, 130 S.E.2d at 121.

[25] Jerre S. Williams, *The Labor Dispute Disqualification--A Primer and Some Problems*, 8 VAND. L. REV. 338, 340 (1955) ("The critical breaking point would seem to be about a 20 to 30 percent cut in production as being sufficient to establish a stoppage.") (citing Milton I. Shadur, *Unemployment Benefits and the Labor Dispute Disqualification*, 17 U. CHI. L. REV. 294, 310, n.64 (1950)). *See also* Willard A. Lewis, *The Stoppage of Work Concept in Labor Dispute Disqualification Jurisprudence*, 45 J. URB. L. 319, 327

16

20 to 30 percent),[26] Alaska (decrease in production by 20 to 30 percent),[27] Maryland (decrease in production by 20 to 30 percent),[28] Massachusetts (decrease in production by 20 to 30 percent),[29] Nebraska (decrease in production by 20 percent),[30] and Hawaii (decrease in production by 20 to 30 percent).[31]

(1967) ("'Stoppages' have been found to exist where there has been a decrease of total business in excess of 30 percent, and a decrease of 20 percent of normal production.") (hereinafter *Lewis*).

[26] *Tri-State Motor Transit Co. v. Indus. Comm'n Div. of Emp. Sec.*, 509 S.W.2d 217, 225 (Mo. Ct. App. 1974) (20 to 30% cut in production appears to be critical breaking point; lower tribunal not clearly wrong in finding that stoppage of work ended where employer's revenues were 16.16% less than gross revenues in the months preceding the strike).

[27] *Twenty-Eight (28) Members of Oil, Chem. & Atomic Workers Union, Loc. No. 1-1978 v. Emp. Sec. Div. of Alaska Dep't of Lab.*, 659 P.2d 583, 592−93 (Alaska 1983) (where lower tribunal found a substantial curtailment of employer operations based on increased costs and labor dispute's effect on employer's tertiary business operations, remanding for determination of whether employer's main business operations were substantially curtailed).

[28] *Emp. Sec. Admin. v. Browning-Ferris, Inc.*, 438 A.2d 1356, 1364 (Md. 1982) (finding no stoppage of work where employer returned to 90% to 100% of prestrike operations by "utilization of management personnel, replacement employees and employees from other divisions of the company").

[29] *Reed Nat'l Corp. v. Dir. of Div. of Emp. Sec.*, 446 N.E.2d 398, 400−01 (Mass. 1983) (reversing order awarding benefits and remanding for further factual findings by administrative body).

[30] *Magner v. Kinney*, 2 N.W.2d 689, 693 (Neb. 1942) (stoppage of work where trucking company's business operations decreased 30%).

[31] *Meadow Gold Dairies-Hawaii, Ltd. v. Wiig*, 437 P.2d 317, 320 (Haw. 1968) (lower tribunal did not err as a matter of law when it found that reduction of production at two dairies (18.65% and 17.66%) was not a stoppage of work).

17

Depending on the facts presented in a particular case, "'indicia of substantialness'" other than production may be relevant, such as "'decreases in business revenue, services rendered, marketing, research, and maintenance, transportation, and construction activities.'"[32] Production is enough in this case. The function of Constellium's Ravenswood plant in 2012 was to produce aluminum plate and coil. Claimants went on strike and Constellium briefly stopped producing. Constellium then restarted limited production after shifting salaried employees from their regularly assigned tasks to bargaining unit, i.e., production, work. Regardless of Constellium's business decision to reassign salaried workers, normal plate production at the plant still fell by 38 percent and coil production by 51 percent—decreases beyond the 20- to 30-percent decrease breaking point noted by other courts referenced above.[33]

In *Cumberland & Allegheny*, we emphasized that whether a stoppage of work has occurred "cannot be determined solely on the basis of the proportionate number of employees affected," and that

> [i]t is conceivable that in some situations a strike or lockout
> affecting relatively few employees would produce a stoppage
> of work if such men were employed in the performance of

---

[32] *Browning-Ferris, Inc.*, 438 A.2d at 1364–65 (quoting *Lewis* at 332).

[33] *Cf. Wolford v. Gaston*, 182 W. Va. 674, 676, 391 S.E.2d 364, 367 (1990) (concluding that 25% reduction in wages was a "substantial, unilateral change" to terms of employment so as to preclude disqualification from unemployment compensation benefits); *Brewster v. Rutledge*, 176 W. Va. 265, 266, 342 S.E.2d 232, 233 (1986) (30% reduction in wages ($3.35 to $2.25 per hour) was "substantial unilateral change" in conditions of night watchman's employment justifying resignation).

18

duties of such vital nature that their unemployment would result in a substantial curtailment of the normal overall activities or operations of the employer. On the other hand, in other situations the unemployment of a proportionately greater number of employees might have no substantial effect on the normal activities of the employer. In some situations, a substantial curtailment of work in a single category or department of the employer's operations might be of such a vital nature as to result in a substantial curtailment of the employer's overall activities if all categories or departments were of an interdependent nature; while, conceivably, in another and different situation, a complete cessation of work in a single category or department of some incidental or minor nature might produce no appreciable curtailment of the overall operations of the employer.[34]

The facts of this case are not like the theoretical close calls discussed in *Cumberland & Allegheny*. Here, Constellium's 680 hourly employees—80 percent of Constellium's available workforce—walked off the job and left 180 salaried employees to maintain some level of production during the strike. Even with the salaried employees' efforts, production of Constellium's main product lines still dipped by 51 percent (coil) and 38 percent (plate). Those figures—an 80-percent reduction in workforce, decrease in production of plate by 38 percent, and decrease in production of coil by 51 percent—demonstrate that Constellium's normal operations were substantially curtailed during the 2012 labor dispute. The Tribunal and Board clearly erred when they found otherwise.

---

[34] *Cumberland & Allegheny*, 147 W. Va. at 639–40, 130 S.E.2d at 121.

Constellium attempted to backstop the absence of bargaining unit employees by reassigning salaried employees to bargaining unit positions. The Tribunal appears to have taken Constellium's ability to continue *any* operations by the efforts of salaried employees as a strong indication that normal operations were not substantially curtailed. That view does not comport with our statement in *Cumberland & Allegheny* that a work stoppage "need not be complete"[35] to trigger disqualification under the labor dispute provision. It also discounts the fact that even with its salaried employees' extra hours worked, "herculean effort, and smart, creative management of resources"—in the words of the Tribunal—Constellium's production levels fell sharply.[36]

The Tribunal and Board's factual findings are due substantial deference, and "the disqualification provisions of the unemployment statutes must be narrowly

---

[35] *Id*. at 638, 130 S.E.2d at 120 (internal quotation omitted).

[36] Claimants also argue that *Cumberland & Allegheny* requires a showing of a backlog of work or services, generally, to demonstrate that the employer's operations were substantially curtailed during the labor dispute. Again, *Cumberland & Allegheny* does not say that. In that case, we discussed the need for a showing of a backlog of work in the non-production categories of work cited by the employer, such as maintenance, meter tests, and handling of service orders. *See Cumberland & Allegheny*, 147 W. Va. at 639, 130 S.E.2d at 121 (following a lengthy list of categories of work that were curtailed during labor dispute—none of which was the employer's primary business of supplying and selling gas—stating that "there was no showing of an accumulated backlog of work or services in *such* categories sufficient in volume or nature to require employment of additional personnel or to require overtime employment on the part of the regular employees after normal operations were resumed") (emphasis added).

construed."[37] We do not defer to those tribunals, however, when we conclude that a factual finding is clearly wrong. Considering that the 2012 labor dispute reduced production at the plant by the rates discussed above and affected 80 percent of Constellium's employees, the Tribunal's and Board's finding that Constellium's normal operations were *not* substantially curtailed due to the labor dispute is clearly wrong. Thus, the lower tribunals' decision that a disqualifying stoppage of work under § 21A-6-3(4) (2012) did not occur at the Ravenwood plant due to the 2012 labor dispute is erroneous, as well.

## B. *Exceptions to Disqualification*

Because a stoppage of work occurred at Constellium's Ravenswood plant during the 2012 labor dispute, Claimants are disqualified for unemployment compensation benefits under § 21A-6-3(4) (2012) unless they can satisfy at least one of three exceptions. We stated in *Roberts v. Gaston* that:

> W.Va.Code, 21A–6–3(4) (1984), disqualifies employees from receiving unemployment compensation benefits if they are involved in "a work stoppage incident to a labor dispute," unless they can satisfy one of three statutory exceptions: (1) the employees are "required to accept wages, hours or conditions of employment substantially less favorable than those prevailing for similar work in the locality"; (2) the employees "are denied the right of collective bargaining under generally prevailing conditions"; or (3) "an employer shuts down his plant or operation or dismisses his employees in order

---

[37] *Smittle v. Gatson*, 195 W. Va. 416, 422, 465 S.E.2d 873, 879 (1995) (citing *Peery*, 177 W. Va. at 551, 355 S.E.2d at 45).

21

to force wage reduction, changes in hours or working conditions."[38]

Based on the evidence offered by Claimants during the November 2012 hearing, the Tribunal found that Claimants had not satisfied any of those exceptions. Neither the Board nor the circuit court disturbed the Tribunal's findings. Now, they are the subject of Claimants' cross-appeal.

Claimants argue that the Tribunal erred in two, general ways. First, Claimants contend that the Tribunal violated their due process rights by blocking them (via the order quashing portions of a subpoena for documents issued to Constellium) from obtaining documents from Constellium that Claimants believe will support this theory: Constellium's collective bargaining in 2012 was controlled by a parent company in Paris, France, which Claimants deem an unfair labor practice under federal labor law and a denial of their right to collective bargaining under § 21A-6-3(4) (2012). Second, Claimants argue that the Tribunal ignored several unfair labor practices committed by Constellium during collective bargaining in 2012, and so also overlooked that Claimants had necessarily satisfied at least one of the exceptions to disqualification under § 21A-6-3(4) (2012). We consider these issues in turn.

---

[38] Syl. Pt. 1, *Roberts v. Gatson*, 182 W. Va. 764, 392 S.E.2d 204 (1990).

### (1) *The Subpoena Duces Tecum*

Claimants raise their due process argument for the first time on appeal. "Our law is clear in holding that, as a general rule, we will not pass upon an issue raised for the first time on appeal."[39] So, we do not consider claimants' argument that the Tribunal violated their due process rights by quashing requests in the subpoena duces tecum. This portion of Claimants' cross-appeal contains, however, two arguments that Claimants made to the circuit court. Perversely, Claimants have injected these old arguments into their novel due process argument. Out of an abundance of caution, we briefly address those arguments included in the due process portion of Claimants' cross-appeal which they also raised below.

Claimants argue the requests quashed by the Tribunal are very specific, not "vague, general and unnecessarily cumbersome" as the Tribunal labelled them. The Tribunal was correct: the requests are anything but specific. For example, in the first request, Claimants demanded:

> 1. All communications, memos, emails, text messages, videos and pictures between Constellium Rolled Products

---

[39] *Mayhew v. Mayhew*, 205 W. Va. 490, 506, 519 S.E.2d 188, 204 (1999). Still, "[a] constitutional issue that was not properly preserved at the trial court level may, in the discretion of this Court, be addressed on appeal when the constitutional issue is the controlling issue in the resolution of the case." Syl. Pt. 2, *Louk v. Cormier*, 218 W. Va. 81, 622 S.E.2d 788 (2005). For the reasons discussed later in this opinion, Claimants' ability to present evidence to bolster their claim that in 2012, Constellium's collective bargaining was controlled by third parties in France does not control the ultimate issue of whether Claimants have satisfied one of the exceptions to disqualification under § 21A-6-3(4) (2012), so we do not exercise our discretion to consider Claimants' due process argument.

23

Ravenswood, LLC employees or its agents, including AFIMAC, regarding union members of Constellium Rolled Products Ravenswood, LLC, regarding the labor dispute between United Steelworkers ("USW") Local Union 5668 and Constellium Rolled Products Ravenswood, LLC.

The request is not limited in time. It does not identify the Constellium employees whose communications are sought, such as those of the Chief Executive Officer or the Vice President of Human Resources (Constellium's chief negotiator in 2012). And, it does not indicate the subjects of the communications sought, other than "union members" and "the labor dispute," which are both huge categories. If enforced by the Tribunal, Constellium would have had to produce each communication by any of its employees (or those of its affiliates) to any of its employees (or those of its affiliates) regarding union members or the labor dispute. Requests 2 and 3 resemble the first. The Tribunal's assessment was not incorrect: the requests are vague, general and unnecessarily cumbersome, as are the other two requests it quashed.[40]

Second, Claimants appear to argue that the subpoena should have been enforced so long as it might have produced *some* relevant evidence. They cite West Virginia Rules of Evidence 401 (Test for Relevant Evidence), 402 (General Admissibility

---

[40] *Cf. Kahle's Kitchens, Inc. v. Shutler Cabinets, Inc.*, 240 W. Va. 209, 217, 809 S.E.2d 520, 528 (2018) (naming "the breadth of the document request, the time period covered by it, and the particularity of the documents described" as some of the "factors to consider when assessing whether a subpoena duces tecum subjects a witness to an undue burden") (quoting Palmer & Davis, *Litigation Handbook on West Virginia Rules of Civil Procedure* § 45(d) at 1132−33 (5th ed. 2017)).

of Relevant Evidence), and 403 (Excluding Relevant Evidence for Prejudice, etc.) for support. But those rules do not address the question answered by the Tribunal: whether the subpoena for documents subjected Constellium to an undue burden?[41] Importantly, Claimants do not argue that the Tribunal lacks the authority to quash the requests,[42] but only that it exercised its authority mistakenly. And, although the Tribunal told Claimants why it was quashing the requests, it does not appear that Claimants recalibrated the requests and tried again to obtain documents they maintain were vital to allow them to prove foreign control over Constellium's bargaining. For all those reasons, we will not say that the Tribunal erred in quashing portions of the subpoena duces tecum as "vague, general and unnecessarily cumbersome."

### (2) Exceptions to Disqualification

We turn to the Claimants' argument that notwithstanding the quashed requests in the subpoena duces tecum, the Tribunal ignored unfair labor practices committed by Constellium during collective bargaining in 2012 so that Claimants necessarily satisfied at least one of the exceptions to disqualification under § 21A-6-3(4) (2012). Constellium responds that Claimants' arguments rest on an inaccurate reading of

---

[41] *Cf.* W. Va. R. Civ. P. 45(d)(3)(A)(iv) (providing that, "[o]n timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it . . . subjects a person to undue burden").

[42] *Cf.* W. Va. C.S.R. § 84-1-5.3, Rules of Evidence and Procedure (providing that the Board of Review and its subordinates are not required to follow the common law or statutory rules of evidence or procedure, but not precluding them from considering those rules in conducting the proceedings before them).

*Roberts v. Gaston*, a case in which we endeavored to put meat on the bones of the exceptions to disqualification under § 21A-6-3(4).[43] Constellium is correct.

In *Roberts*, this Court was asked to review the Board's denial of unemployment compensation benefits to striking workers.[44] The workers argued that they were not disqualified from benefits because the employer had denied them the right to collective bargaining under generally prevailing conditions (exception 2) and required them to accept contract terms that were less favorable than those in their old contract (exception 1).[45]

The meaning of "denied the right of collective bargaining under generally prevailing conditions" was an issue of first impression. The Court observed that the National Labor Relations Act[46] can guide interpretation of the phrase "denied the right of collective bargaining," under § 21A-6-3(4) and then went on to survey certain principles of federal labor law.[47] Despite that discussion, this Court did not hold that a violation of

---

[43] *Roberts*, 182 W. Va. at 764, 392 S.E.2d at 204.

[44] *Id*. at 766, 392 S.E.2d at 206.

[45] *Id*.

[46] 29 U.S.C. §§ 151−169.

[47] *Roberts*, 182 W. Va. at 768−71, 392 S.E.2d at 208−10 (quoting 29 U.S. Code § 158(d) (defining collective bargaining)).

federal labor law is necessarily a denial of the right to collective bargaining under West

Virginia's labor dispute provision. Instead, this Court said the opposite:

> It is obvious that these general principles [regarding the denial of the right of collective bargaining under § 21A-6-3(4)] are substantially different from the ordinary inquiry that is made under federal labor law in order to find an unfair labor practice based on the duty to bargain collectively. Under our unemployment compensation statute, the test is not whether the employer may have committed an unfair labor practice, but whether his actions amounted to the denial of the right of collective bargaining.[48]

This Court then held that, "[a] refusal to engage in the collective bargaining process or to

negotiate on those mandatory subjects that traditionally form the basis of the collective

bargaining agreement so frustrates the process as to constitute a denial of the right of

collective bargaining under W.Va.Code, 21A–6–3(4) (1984)."[49]

With that in mind, we turn to the Tribunal's discussion regarding Claimants'

arguments that Constellium denied them their right of collective bargaining under

§ 21A-6-3(4):

> In this case, the claimants' union and the employer met and exchanged proposals. There was give and take, concessions by each party on different issues, and meaningful negotiations. The parties were able to resolve the non-economic issues in controversy. The parties struggled to resolve the economic issues, in part because of each party's positions on the "medical

---

[48] *Id*. at 771, 392 S.E.2d at 211.

[49] Syl. Pt. 2, *id*. at 764, 392 S.E.2d at 204.

necessity" term of the medical insurance coverage provided by the employer.

. . . .

However, considering the entire record, including that the employer met with the claimants['] union many times and there were concessions and exchange on different issues, it is considered there were meaningful negotiations between the parties.

Claimants do not argue that the Tribunal's account of the parties' bargaining is inaccurate. Instead, they argue that Constellium's lead negotiators lacked final authority to bind the company on economic proposals—an alleged unfair labor practice—and engaged in bad faith bargaining by insisting on the medical necessity clause—another alleged unfair labor practice.[50] As the Tribunal observed, whether an employer has committed an unfair labor practice under federal law is not the inquiry to determine whether its "actions amounted to the denial of the right of collective bargaining;"[51] it is whether there is "[a] refusal to engage in the collective bargaining process or to negotiate on those mandatory subjects that traditionally form the basis of the collective bargaining agreement

---

[50] Claimants also include a single sentence argument that a communique from Constellium's CEO to union members establishes bad faith bargaining under § 21A-6-3(4). "Although we liberally construe briefs in determining issues presented for review, issues which are not raised, and those mentioned only in passing but are not supported with pertinent authority, are not considered on appeal." *State v. LaRock*, 196 W. Va. 294, 302, 470 S.E.2d 613, 621 (1996). We do not, therefore, address Claimants' assertion.

[51] *Roberts*, 182 W. Va. at 771, 392 S.E.2d at 211.

so frustrates the [collective bargaining] process as to constitute a denial of the right of collective bargaining under W.Va.Code, 21A–6–3(4) (1984)."[52]

Here, there is simply no dispute that the parties engaged in the collective bargaining process and negotiated on subjects that are traditionally the basis of collective bargaining agreements. Again, as the Tribunal related,

> [t]he negotiations between the union representatives and the employer representatives to review the collective bargaining agreement began in May 2012. There were 26 sessions before the labor dispute began August 5, 2012. During the sessions, there were concessions made by the employer and the claimants' union on non-economic issues and economic issues. The parties agreed to first address the noneconomic issues before the economic issues were addressed. The parties resolved the non-economic issues. The parties were not able to resolve the disagreements of [sic] economic issues, so a strike ensued August 5, 2012.
>
> . . . .
>
> As regard [sic] the economic issues, the employer was willing to make concessions or adjustments to other wage, bonus, or economic issues, if the claimants would agree to the medical necessity clause being included in the new contract. Since the claimants insisted the new contract not have a medical necessity clause, the parties struggled to agree or negotiate on the other economic issues. The employer created and perpetuated the medical necessity issue and controversy which prevented an agreement or resolution of other economic issues.
>
> The parties continued to meet in negotiating sessions after the strike began. The parties met at the governor's

---

[52] Syl. Pt. 2, *id*. at 764, 392 S.E.2d at 204.

mansion to forge an agreement. The employer agreed to add language to the medical necessity paragraph which included "medical necessity is not intended to deny access to health care services or care to our employees or their dependents." With the additional or supplemental language added to the medical necessity paragraph, the employees agreed to vote favorably upon the collective bargaining agreement on September 20, 2012, and returned to work September 24, 2012.

The Tribunal's undisputed account of the parties' negotiations in 2012 does not evince "[a] refusal [by Constellium] to engage in the collective bargaining process or to negotiate on those mandatory subjects that traditionally form the basis of the collective bargaining agreement [that] so frustrate[d] the [collective bargaining] process as to constitute a denial of the right of collective bargaining under W.Va.Code, 21A–6–3(4) (1984)."[53] As this Court observed in *Roberts*, "not every event that may constitute a federal unfair labor practice will constitute a denial of the right of collective bargaining under W.Va.Code, 21A–6–3(4)."[54] Considering the frequency and constancy of the parties' bargaining sessions, the progress made on non-economic matters and, later, on economic matters, plus each parties' eventual willingness to compromise, we cannot say that the alleged control of Constellium's collective bargaining in 2012 by a third-party or

---

[53] Syl. Pt. 2, *id*. at 764, 392 S.E.2d at 204.

[54] *Id*. at 771, 392 S.E.2d at 211.

Constellium's position regarding the medical necessity clause establishes a deprivation of Claimants' rights to collective bargaining.[55]

Claimants also contend that the company's insistence on the medical necessity clause was an attempt to force a wage reduction under § 21A-6-3(4) (exception number 3). Contrary to Claimants' position, an employer's pursuit of a wage reduction, changes in hours or working conditions during collective bargaining is not *itself* an exception to disqualification under § 21A-6-3(4). The statute in effect at the time of the 2012 labor dispute states: "No disqualification under [§ 21A-6-3(4)] is imposed . . . if [1] an employer shuts down his or her plant or operation or dismisses his or her employees [2] in order to force wage reduction, changes in hours or working conditions." Claimants' argument—that by pursuing the medical necessity clause during collective bargaining Constellium sought a de facto wage reduction—ignores the necessary first component of this exception to disqualification: "that the employer acted to shut down the work site."[56] Here, *Claimants* walked out on August 5, 2012. Constellium did not "act to shut down [its] plant, operation or to dismiss [its] employees,"[57] so Claimants cannot satisfy the requirements of the third exception in § 21A-6-3(4). In sum, contrary to Claimants'

---

[55] *Cf. Smittle*, 195 W. Va. at 429, 465 S.E.2d at 886 (reasoning that where "the record show[ed] that [employer] did negotiate with its employees before the contract expired, the letter incident standing alone was not a denial of the right to bargain collectively").

[56] Syl. Pt. 4, in part, *id*.

[57] *Id*. at 424, 465 S.E.2d at 881.

argument in their cross-appeal, we do not find that the Tribunal erred when it quashed

certain requests for documents in the Claimants' subpoena duces tecum, nor do we find

that the Tribunal erred regarding the exceptions to disqualification in § 21A-6-3(4) (2012).

## C. *Preemption*

We quickly dispose of Constellium's argument that the labor dispute

disqualification is preempted by federal labor law.[58] The employer in *Roberts* made a

similar argument:

> PPG appears to argue that if we attempt to determine whether a failure to bargain has occurred under our employment security statutes by reference to whether an unfair labor practice has been committed, we would be pre-empted from doing so under the principles announced in *New York Tel. Co. v. New York State Dep't of Labor*, 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979). This case holds that a state is not precluded by the doctrine of federal labor law pre-emption from authorizing the payment of unemployment compensation benefits to persons while they are out of work on strike.[59]

We then stated that we found "nothing in [*New York Tel. Co.*] which prevents us or the

state unemployment agency from referring to the federal labor law to determine whether

there is either a failure to bargain collectively or to determine if unfair labor practices rise

---

[58] *See Wisconsin Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 286 (1986) (stating that "[c]entral among [principles of the NLRA's preemptive scope] is the general rule set forth in *San Diego Building Trades Council v. Garmon* . . . that States may not regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits").

[59] *Roberts*, 182 W. Va. at 769 n.5, 392 S.E.2d at 209 n.5.

to this level."[60]  The circuit court relied on *Roberts* and its endorsement of *New York Telephone* to reject Constellium's preemption argument.

Constellium concedes that a state may categorically grant or deny unemployment compensation during labor disputes under *New York Telephone* without inserting itself into the federally regulated collective bargaining process.  Instead, Constellium argues that a state "may not use its unemployment compensation statutes to *regulate bargaining behavior by the employer or the union*."[61]  Constellium contends that the Tribunal and the Board did that in this case by applying the labor dispute provision in a such a way as to penalize "employers who resort to lawful self-help techniques during a strike," i.e., by finding that Constellium's resort to a contingency plan to maintain some level of operations during the labor dispute justified payment of unemployment compensation benefits to Claimants under §21A-6-3(4).

We have rejected the Tribunal's apparent conclusion that Constellium's continued production during the labor dispute, however far reduced, established that its normal operations were not substantially curtailed and that a work stoppage had not occurred.  Consequently, Constellium's main preemption argument—that the Tribunal used the labor dispute provision to regulate Constellium's conduct and to level the parties' positions during the labor dispute—is moot.  Further, as we stated in *Roberts*, "[u]nder our

---

[60] *Id.*

[61] Emphasis in original.

unemployment compensation statute, the test is not whether the employer may have committed an unfair labor practice, but whether his actions amounted to the denial of the right of collective bargaining."[62]  As demonstrated above, the inquiries are not coextensive, and our consideration of the exceptions to disqualification in § 21A-6-3(4) may be guided by federal law, but they are not controlled by it.  For those reasons, we affirm the circuit court's order insofar as it denied Constellium's appeal on preemption grounds.

## IV.  CONCLUSION

For the reasons set forth above, the final order of the Circuit Court of Kanawha County entered on June 12, 2020, is reversed in part and affirmed in part, and the case is remanded for entry of an order denying the claimants' applications for unemployment compensation benefits.

Reversed in part and affirmed in part and remanded with directions.

---

[62] *Roberts*, 182 W. Va. at 771, 392 S.E.2d at 211.

34